Alison **PALMER**, et al., Plaintiffs,

v.

George P. **SHULTZ**, Defendant.

Marguerite **COOPER**, et al., Plaintiffs,

v.

George P. **SHULTZ**, Defendant.

**Civ. A. Nos. 76–1439, 77–2006.**

United States District Court, District of Columbia.

Sept. 13, 1985.

Bruce J. Terris, Ellen K. Wayne, Terris & Sunderland, Washington, D.C., for plaintiffs.

Diane M. Sullivan, Stuart Newberger, Asst. U.S. Attys., Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN LEWIS SMITH, Jr., District Judge.

These consolidated cases involve a class action brought against the Department of State alleging sex discrimination against female Foreign Service Officers (FSO's) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* The plaintiff class is composed of all female Foreign Service Officers employed by the Department of State at any time since February 4, 1976 and all female applicants to become Foreign Service Officers since February 4, 1976.[1] The nine individual plaintiffs are Alison Palmer, Mary A. Ryan, Ellen Shippy, Marguerite Cooper, Mary Lee Garrison, Mary Finrow, Laurel Cooper, Mary Hartman, and Julie Ann McGrath.

Plaintiffs allege that the Department of State engaged in sexual discriminatory practices against female FSO's and FSO applicants in all aspects of the employment process, to wit: (a) hiring, (b) cone assignments, (c) job assignments, (d) promotions, (e) performance evaluations, (f) awards, and (g) class at hire. Plaintiffs' hiring claims were settled prior to trial in the form of two consent decrees. The first consent decree was entered on October 12, 1983 and resolved all claims raised by those class members who had applied to become Foreign Service Officers at the Junior Applicant level. The remaining class applicant/hiring claims were settled with the March 5, 1985 entry of the Mid-Level Consent Decree. Defendant denies each and every one of the remaining claims, contending that the Department of State has consistently complied with the spirit and requirements of Title VII. Trial on the remaining claims was bifurcated, and the liability issues were tried beginning on May 6, 1985, and concluding on June 5, 1985.

Upon consideration of the testimony of the witnesses, exhibits admitted into evidence, and the entire record herein, the Court, pursuant to Fed.R.Civ.P. 52, enters the following findings of fact and conclusions of law.

### Findings of Fact

1. The Foreign Service of the United States is charged with assisting "the President and the Secretary of State in conducting the foreign affairs of the United States." 22 U.S.C. § 3901(a)(1).

2. The Foreign Service is administered by the Secretary of State under the direction of the President. 22 U.S.C. § 3921(a).

3. While performing its many varied duties throughout the world, the Foreign Service is responsible for maintaining the best possible relations with the government to which accredited.

### Cone at Entry

4. In the early 1960's, the Department decided that Foreign Service Officers should be selected for hire into a particular cone, that is, functional field of specialization, while continuing to be required to show generalist aptitude. Four cones were established to reflect the four main areas

---

1. The class does not include those individuals who have timely opted out of the suit pursuant to Federal Rule of Civil Procedure 23(c)(2). The certified class also does not include FSO's serving the Agency for International Development, the United States Information Agency, the Foreign Agricultural Service, or the Foreign Commercial Service.

of specialization: political, economic/commercial [2], administrative and consular. Prior to that time FSO's were hired as generalists. Later in their careers, many but not all developed a field of specialization. It was determined that the generalist selection method had resulted in a surplus of political and political/economic officers and an insufficient number of officers in the other fields (consular, administrative and commercial). In addition, management believed that more specialized expertise was required to meet the increasingly complex demands placed on the FSO corps.

5. Administrative officers are responsible for support operations of U.S. embassies and consulates.

6. Consular officers work closely with the public providing assistance to American travelers and residents abroad, issuing visas, and other immigration related issues.

7. Economic officers deal with economic issues that impact on U.S. interests, including trade, energy, aviation, and maritime matters. These officers perform their duties by both gathering and reporting data back to the U.S. and by taking part in economic negotiations with foreign entities.

8. Political officers analyze and report on political questions which affect U.S. interests. They gather data to report back to the U.S. while also maintaining close contacts with foreign political and labor leaders.

9. Since establishment of the cone system, officers have been assigned to a cone at the time of hire. The officer's cone is reflected as the officer's primary skill code. A cone may include individuals with a number of different primary skill codes. For example, political officers, political-military affairs officers, and labor-political affairs officers all constitute different skill codes, yet all are within the political cone.

10. Since the institution of cones in the early 1960's, it has not been the policy of the Department to encourage FSO's to change cones. This is due to the fact that recruitment and appointment have been conducted by cone, in accordance with, *inter alia*, anticipated work-force needs. If substantial numbers of officers changed cones, this could result in the imbalances which had previously existed. Except for a short period from mid-1977 to mid-1978 when there was a freeze on cone changes, however, a procedure has existed which specified certain prerequisites for changing cones.

11. For the period 1971 through mid-1977, an officer who wished to change cones would request his/her Career Development Officer (CDO) to make the change. That CDO would consult with the CDO for the desired cone, the two CDO's would consider the officer's performance in out-of-cone assignments in the desired cone and any other relevant credentials (*e.g.*, academic background). If they agreed that the officer would be competitive in the desired cone, they would recommend the change to the interfunctional assignments panel, which had the final responsibility for approving the change.

12. New procedures were adopted in June 1978 (Department Notice: Primary Skill Code Changes, June 8, 1978) which permitted cone changes under certain specified circumstances. Those procedures were in effect until May 1979.

13. New procedures were again adopted in May 1979 (Department Notice: Procedures for Primary Skill Code Changes, May 22, 1979). Those procedures have been in effect since that time and continue to constitute the only method available for changing cones.

14. Officers can expect to serve the major portion of their time in the Service in positions in their assigned cones, although officers may obtain out-of-cone assignments to other cones or to interfunctional positions.

---

2. Primary responsibility for the commercial function was transferred to the Department of Commerce in 1979.

15. The majority of FSO's enter the Foreign Service pursuant to the written and oral examination process. Beginning with the 1975 written examination, candidates were tested in all four functional fields on the written examination.

16. Between 1975 and 1979, the Junior Officer Division of the Foreign Service Career Development and Assignment Office of the Bureau of Personnel (FCA/PER) was responsible for the conal assignment of junior officers. FCA/PER would review each candidate's file, looking at his or her academic and work experience, written and oral examination results, and stated conal preference, if any. Based on this review FCA/PER would select a cone for the candidate. If a candidate disagreed with the conal designation, he or she was free to discuss the option of obtaining a different designation.

17. Those FSO's who entered the Service pursuant to the lateral entry programs acquired cone designations as part of the lateral entry process. Lateral entry applicants themselves selected, in advance, the functional field in which they wished to compete and were evaluated only for that specific cone.

18. Candidates attempting entry into the Foreign Service pursuant to the Affirmative Action Junior Officer Program (AAJOP) and Mustang Program obtained their initial cone assignments in a manner similar to other junior officers in that the Foreign Service Career Development and Assignment Office (FCA) matched the applicant's background and experience with the requirements of the four functional fields. In addition, since 1984, AAJOP applicants must also take the written examination.

19. Beginning in 1980, candidates who pass the written examination, the assessment process and the remaining steps of the selection procedure are placed on rank-order registers for all cones for which they passed the corresponding functional field test in the written examination. They are eligible for appointment to the Foreign Service officer corps, if reached, in any of the cones for which they passed a functional field test, but not in those cones in which they did not pass the functional field test. Actual offers of appointment are made in rank order, with the person who has the highest score on any conal register being offered the first appointment.

20. Candidates are free to accept or decline an offer, but are not guaranteed that a subsequent offer will be made, either in the same cone or, if the candidate is eligible, in a different cone. If a candidate is reached on more than one register in advance of a convening of a given initial training course, he or she may choose the cone of appointment.

21. Plaintiffs claim that women have been disproportionately overassigned to the consular cone and disproportionately underassigned to the political cone during the relevant time period, 1976–1983. Plaintiffs contend this pattern remains consistent regardless of whether the analysis involves all hires from 1976–1983, hires into Classes 7 and 8 during that time period, or hires who took the 1975 through 1980 written examination.

22. The analysis by plaintiffs' expert concluded that, during the 1976–1983 period, 84 (20.8%) of the women shown on defendant's computer tapes as being placed into one of the four cones within their first year as an FSO were assigned to the political cone, in comparison to 328 (30.3%) of the men hired. The difference means that 34 fewer women were assigned to the political cone than might have been expected based on their proportion among FSO hires. This difference measures 4.46 standard deviations and would occur by chance less than 1 time in 100,000.

23. Conversely, during the same time period, plaintiffs' analysis claimed that 154 (38.1%) of the women hired were assigned to the consular cone, in comparison to 242 (22.3%) of the men. This difference means that 48 more women were assigned to the

consular cone than would be expected given their representation among the new FSO's. It constitutes a discrepancy of 6.39 standard deviations, which would occur by chance less than 1 time in 1,000,000.

24. Plaintiffs' statistics indicate that, when examining those FSO's who entered the Service between 1975 and 1980 through the normal exam procedures, 16.9 more females were assigned to the consular cone than might be expected based on their proportion among FSO hires. This difference measures 2.99 standard deviations.

25. During the same 1975–1980 time period, again looking only at those FSO's who entered the Service through the exam procedures, plaintiffs' expert found that 17.6 fewer females were assigned to the political cone than would be expected based on their proportion among FSO hires. This difference measures 3.29 standard deviations.

26. Plaintiffs' expert discounted the level of educational attainment at hire and educational major as explanations for the discrepancy in cone assignments of exam applicants.

27. Plaintiffs' expert contended that, as to exam takers, the scores received by candidates on the four functional field tests of the Foreign Service written examination differed by sex and were related to cone assignment. The scores from the 1975–1980 written examination indicated that women hired between 1976 and 1983 had significantly lower average scores on the political functional field test than men, but that the average score of men and women on the consular functional field test was about equal.

28. A logistical regression performed by plaintiffs' expert on the cone assignment of those persons who took the 1975–1980 written examinations and were hired between 1976 and 1983, which took into account the effect of level of educational attainment, major field of study, functional test scores, and sex on cone assignments,

purported to show that test scores substantially explain cone assignments. When allowing for the functional field test scores, the analysis indicates no statistically significant disparity in assignment of females and males to the consular cone. As to assignment to the political cone, the disparity measures only 1.66 standard deviations.

29. Plaintiffs' analysis of exam takers is flawed and inconclusive in establishing disparate impact in cone assignment. It was established that the expert's determination of total FSO hires for the year 1981 was incorrect. Plaintiffs' expert at times had difficulty identifying the cone at hire of the FSO's, and chose to delete those officers from the analysis, along with any FSO's not assigned to the four major cones. Though the expert disclaimed the significance of those actions, the Court is not persuaded.

30. Defendant contends that women have a preference for the consular cone which explains the disparities in cone assignments. Defendant relies on the preferences of women who were hired between 1976 and 1983 and who took the 1973 or 1974 examination as an indicator of the cone preference of all women hired between 1976 and 1983. On the 1973 and 1974 examinations, a candidate selected one functional field test for which she wished to be considered for appointment to the Service. Using this analysis, defendant concluded that more females than males historically preferred to apply for the consular cone.

31. Defendant did not rely on a showing that the political functional field test was job related.

32. There are proportionately more promotion opportunities in the consular cone than in the political cone.

33. Presently, there is an overabundance of political officers, making competition for promotion and assignments especially keen in that cone.

34. The consular cone, though downgraded by some in the past, has attained a

level equal to that of the political cone in terms of importance to the overall foreign policy of the United States. The services performed by the FSO's in the consular cone are vital to the interests of the United States because of the constant contact with foreign citizens.

35. Due to the ever increasing importance of the consular cone, many FSO's feel this is the cone to select in terms of career advancement.

36. No credible testimony was offered that any female FSO had been denied assignment to the political cone or gained assignment to the consular cone because of sexual discrimination.

### Grade at Entry

37. Between 1972 and 1983, the substantial majority of FSO's in the Foreign Service entered the Foreign Service as junior officers in Classes 7 and 8.

38. Prior to 1980, applicants who succeeded in the written and oral examination process were appointed at Class 8 or 7, though the exact classification either as junior officers, temporary Foreign Service Reserve Officers, or Career Candidates has differed. Under the Foreign Service Act of 1980, appointment is now possible at the Class 6 level, as well as at Classes 7 and 8.

39. Plaintiffs' expert presented a statistical examination of the initial grade at entry of officers hired into Classes 8 and 7 between 1972 and 1983. The results of that analysis indicate that approximately one-third of the women, but only 23% of the men, entered at Class 8 between 1972 and 1983. That difference measures 4.1 standard deviations which means that this result would be due to chance less than once in 10,000.

40. Looking at the relevant time period, 1976–1983, there was no statistically significant disparity in grade at hire between males and females. The difference measures a standard deviation of 0.52, when controlling for educational level.

41. Examining 1976–1977, the only time period for which plaintiffs assert that the alleged discrimination in class at hire occurred, the summary difference between males and females assigned to Classes 7 and 8 measures 1.15 standard deviations, when controlling for educational level.

42. When examining Foreign Service entrants from 1976 to 1983 at Classes 5–8, women entered at an average class of 6.9 and men entered at 7.1. In terms of salary, the average male upon entry to the Foreign Service earned a salary of $21,700 while an average woman earned $22,800.

43. The higher average starting class of women in Classes 5–8 derives from the disproportionate number of women entering the Foreign Service at Class 5 as a result of the mid-level affirmative action program which was intended to bring more women into the mid-levels of the Service. The effect of lateral entrants offsets any perceived effect at Classes 7 and 8.

44. There was no credible testimony that female FSO's were discriminated against on the basis of sex in obtaining their initial class assignments.

### Awards

45. The Department of State administers an Incentive Awards Program for the Foreign Service. Plaintiffs' expert analyzed one segment of the Department's program, the Honors Awards, which includes the Distinguished Honor Award, the Superior Honor Award, and the Meritorious Honor Award.

46. "Honor Awards recognize outstanding achievement and bestow singular honor and official recognition to an individual or group. As appropriate, honor awards may be supplemented by a cash payment or meritorious service or quality increase, if the employee is nominated for such increase." 3 FAM 642.2.

47. Plaintiffs' expert analyzed the three awards by sex for the period 1976 to 1983. The statistics show no statistically signifi-

cant disparity between the number of men and women receiving either the Distinguished Honor Award or the Meritorious Honor Award. With reference to these two awards, females are as likely as males to receive them.

48. In regards to the Superior Honor Award, plaintiffs' expert produced statistics indicating that 4.8% of the award recipients were females, although 10.1% of the Class 1 through 5 FSO's during the time period were females. These results indicate that twice as many women would be expected to receive the Superior Honor Award as actually received it. The difference measures 3.1 standard deviations and would occur as a product of chance in a nondiscriminatory system only 1 time in 1,000.

49. No showing was made by plaintiffs' expert of how the failure of women to receive the Superior Honor Award affected the opportunity for promotion.

50. Plaintiffs' expert established no basis for his comparison of actual awards with expected awards. No showing was made by plaintiffs' expert of what portion of female FSO's were qualified for the Superior Honor Award. The expert's analysis was based on a faulty assumption that all female FSO's were equally qualified for the Superior Honor Award.

51. No credible anecdotal evidence was presented of female FSO's being denied Superior Honor Awards because of sex discrimination.

### Evaluations

52. Written appraisals, known as Officer Evaluation Reports (OER's) or Employee Evaluation Reports (EER's), are generally prepared on all FSO's annually.

53. A standard EER form is required for the evaluation of performance periods of 120 days or longer. Beginning in 1978, the end of the annual rating period for tenured officers was changed from May 15 to April 15.

54. Evaluations are prepared by an FSO's rating officer, who must be the rated member's supervisor, except under unusual circumstances. The rating officer's report is then reviewed by a reviewing officer, who is normally the rating officer's supervisor. The rating and reviewing officers are generally designated at the beginning of the rating period with the rated officer informed as to their identities.

55. The Foreign Affairs Manual requires that "[a] description of the [rated officer's] duties be agreed upon in writing within 45 days of the beginning of the rating period and amended, as necessary, with each change of assignment, assumption of additional duties, or other circumstances which warrant a review of performance against the standard of work expected of the [rated officer]." 3 FAM 522.-1(a).

56. The evaluations are used both as part of the promotion process and by career development officers in evaluating their client FSO's and advising them of assignments that would advance their careers and to which they could reasonably aspire.

57. The evaluations are highly subjective and are generally seen as producing inflated ratings.

58. For the spring 1974 rating cycle, defendants adopted an OER form that, as part of its "Evaluation of Potential" section, required the rating officer to select, from a list of some 28 characteristics, five qualities best characterizing the rated officer and three that least characterized him or her. Plaintiffs claim that the women's ratings on this section of the 1974 OER differed substantially from those of men, giving women characteristics of fairness, empathy, perseverance, thoroughness, and systematic work habits, whereas men were characterized as being strong on policy orientation, leadership, and ability to anticipate. Plaintiffs contend not only do the males' ratings simply differ, but are detrimental to promotion opportunities for female FSO's.

59. Plaintiffs' evidence does not establish that a difference existed in the ratings or that it was discriminatory. Alison Palmer, a named plaintiff, testified that she was rated highly on perseverance and thoroughness, but was also rated highly on perception of key issues. The 1974 OER's of Ellen Shippy and Mary Lee Garrison, also named plaintiffs, rated them highly in only one of the complained of categories, systematic work habits.

60. Neither the March 2, 1979 affidavit of Richard B. Moon (PX 125), then Director of the Office of Performance Evaluation, Bureau of Personnel, United States Department of State, nor the study by Carman Williams (PX 131) any more clearly supports plaintiffs' contentions. The results of the Williams study are admittedly inconclusive, and no showing was made of the statistical significance of the numbers used. Indeed, the figures associated with female FSO's are not even mentioned. The Moon affidavit merely expresses a concern by the Department of State that the 1974 OER may contain a sexual bias. The statement falls short of amounting to an admission but instead points to the Department's quick response to change the rating procedure when even a question of discrimination was raised. Such a reaction does not prove the fact of discrimination, but illustrates the Department's sensitivity to the issue.

61. Plaintiffs performed a survey of the summary performance and potential ratings in the 1977 OER's of a random sample of Classes 5 and 6 FSO's. Plaintiffs' expert identified a random number of Classes 5 and 6 FSO's and defendants permitted plaintiffs to copy certain information from the 1977 OER's concerning the officers' overall performance and potential ratings. When an officer received more than one OER during the time period only the first OER was included.

62. The survey indicated that there was no significant difference in the performance ratings of men and women, but that the mean female potential rating was 6.98 and was 7.27 for males. The disparity between men and women measured 2.49 standard deviations, which means that there was only a possibility of 7 in 1,000 that it was due to chance.

63. Plaintiffs' expert also analyzed the potential ratings while holding the performance rating constant. That is, the expert compared the potential rating of female and male FSO's who received a performance rating of 5, signifying a very good performance. The analysis also included performance ratings of 6, 7, and 8. The results showed that at performance levels 6 and 7, a disparity existed with standard deviations measuring 2.55 and 2.03, respectively. No statistically significant disparity existed for performance ratings at levels 5 and 8.

64. There was no attempt by plaintiffs' expert to relate his analysis of evaluations to the likelihood of promotion.

65. The methodology utilized by plaintiffs' expert of examining only one 1977 OER fails to allow for one vital characteristic, that being female FSO's have less time in class than males. This inexperience would account for the lower potential ratings when compared with males who have more time in class. The analysis does not compare equally situated males and females, that is, there is no comparison of the potential rating of males and females with equal time in class. While the actual performance of males and females may not be reflected by the inexperience, a subjective judgment on the potential capacity of an FSO may certainly be affected by such inexperience resulting from less time in class.

66. The failure of plaintiffs' expert to control for time in class in analyzing the comparison of potential rating of males and females lessens the significance of the study in showing any discrimination.

67. Plaintiffs also contend that the narrative sections of the evaluations rate wom-

en differently than men. Plaintiffs produced several women who testified that the narratives tend to stereotype women, emphasizing their interpersonal skills, while the narratives concerning men emphasize their substantive and intellectual skills. Plaintiffs' witnesses testified that the Foreign Service considers intellectual and substantive skills to be far more important than interpersonal skills.

68. The testimony does not establish that sex discrimination exists in the narrative portions of the OER's.

### Assignments

69. FSO's and other employees within the Foreign Service personnel system hold a personal rank (class). In addition, each position that an FSO might hold is also classified as being at a certain grade level or rank. FSO's can be assigned to positions which are above or below their personal rank.

70. Each position that an FSO might hold is either classified as being within one of the four main cones or as an "inter-functional" position. FSO's are generally assigned to positions within their own cone, although "out-of-cone" assignments are permitted.

71. FSO's are assigned to new positions on a frequent basis, generally every two to three years. These changes in job assignments almost always entail changes in duties and frequently, changes in location. Each such assignment becomes a part of the officer's employment record.

72. FSO's are required by law to be available for service worldwide. While serving overseas, FSO's may be assigned to one of approximately 260 posts located around the world or they may be detailed to other United States government agencies, international organizations, or private sector organizations. While in the United States, FSO's may be assigned to positions within the Department of State, detailed to other federal agencies, assigned to training or loaned to state or local governments.

73. Since 1975, FSO assignments have been subject to the Open Assignment Policy as set forth in Standard Operating Procedures, No. A–1 (revised 1/14/77) and Standard Operating Procedures, No. A–1 Addendum (revised 1/7/77), recently superseded by Standard Operating Procedures, No. A–1 (approved 9/83).

74. Under the Open Assignment Policy, all position vacancies are advertised in advance to all employees through worldwide cables permitting everyone to "bid" on the positions they desire. Officers, as they are due to complete their assignments, send a bid list of their preferences to their CDO. These preferences are consolidated for each available position and presented to the appropriate regional or functional bureau in the form of a "bid book," which lists all positions and the name of all bidders. Assignment officers, who represent the interests and preferences of the geographic and functional bureaus in which the positions are located, receive recommendations of candidates from the bureaus. In developing their recommendations, the bureaus review the list of bidders and solicit information about them from persons working inside or outside the bureau. The bureau preferences are transmitted by the assignment officers to the CDO's, who then submit lists of candidates to assignment panels. Assignment panels are composed of CDO's and assignment officers.

75. Since 1975, the assignment procedures have tended to increase the authority of the central personnel system, and have provided the bureaus and posts much influence over the assignment of officers.

76. In addition to the formal procedures for assignments described above, officers often "work the system," that is, use the influence of their former colleagues and supervisors to make themselves better known to the bureaus and posts in order to obtain the assignments they desired. No testimony was presented that these informal procedures, in themselves, discriminated against female FSO's. To the con-

trary, several of plaintiffs' witnesses testified that they had worked the system successfully to obtain their positions.

77. Officers are free to bid on any position compatible with their class and completion date of their current tour, though FSO's are not permitted to bid on positions more than two classes above or below their present class. Assignments to positions above the officer's personal grade are known as "stretch" assignments and are highly sought, since employees generally anticipate that if they perform effectively in a position rated above their present grade, their chances for promotion are considerably enhanced. "Down-stretches," assignments below an officer's personal class, are also possible. Stretch and down-stretch assignments are always made with the concurrence of the individual officer. Simply because an officer bids on a stretch or down-stretch assignment does not mean he or she will receive the assignment.

78. Plaintiffs claim that female FSO's have not been provided the same access as male officers to assignments to Moslem, African, Asian, and Latin American countries, or to the Sinai Field Mission and its successor, the Multi-National Force.

79. Plaintiffs presented no statistical evidence to support their claim, but instead relied upon anecdotal evidence from a variety of witnesses. The testimony consisted generally either of declarations that the witness did not receive a particular position, for instance with the Sinai Field Mission, or had difficulty in obtaining an assignment to one of the regions involved.

80. Many of the alleged incidents ·of discrimination occurred prior to the relevant time period for this suit and, thus, are irrelevant in terms of establishing any liability. The relevant testimony is inconsistent with other testimony by plaintiffs' witnesses that they had received assignments in the geographic regions involved. Ellen Shippy testified she served as principal officer in Zanzibar. Mary Lee Garrison served in Zaire as an economics officer. Mary Ryan, a named plaintiff, served in Khartoum, as well as in other African posts. Other of plaintiffs' witnesses testified to additional assignments in Africa, Asia, Moslem and Latin American countries.

81. Defendant presented additional female witnesses who testified to serving in the geographic areas at issue and of other women who served with them. In addition, defendant produced a female witness who had served as an administrative officer on the Sinai Field Mission, an entity established in 1976 to monitor activities of Egypt and Israel pursuant to provisions of the Sinai Troop Disengagement Treaty. She testified that other women had served, even though certain positions with the Sinai Field Mission were not open to women as these duties entailed a 24-hour watch and required the American party to share a tiny hut and bedroom with their Israeli and Egyptian counterparts, who were men. Female FSO's also served on the Multi-National Force, the successor of sorts to the Sinai Field Mission.

82. Plaintiffs claim that women have been underrepresented in the assignment to positions of Ambassador and Deputy Chief of Mission (DCM). In support of this claim, plaintiffs introduced the following figures: in 1976, 6 career and noncareer women held Ambassador appointments; in 1977, 6; in 1978, 10; in 1979, 14; in 1980, 13; in 1981, 9; in 1982, 9; in 1983, 7; and in 1984, 4. In 1977, 4 career women served as Ambassadors; in 1980, 6; in 1985, 1. Plaintiffs' expert produced no analysis on the claims of underrepresentation of women in the Ambassador ranks.

83. Although not controlling, it is notable that defendant did produce three female Ambassadors as witnesses.

84. These low figures do not take into account certain realities of the Foreign Service. The number of women in the Foreign Service has historically been a substantially low percentage of total officers. In the last decade, the State Department has instituted a variety of programs to aid in reme-

dying this situation. It is true today that there are more women in the Foreign Service than ten years ago. In 1975, 8.1 percent (250) of FSO's in Classes 1 through 6 were females; in 1983, in those same classes, 16.4 percent (579) of FSO's were females. These women, however, have less time in service and class than the average male.

85. The choices for Ambassador are usually drawn from the highest ranks, the pre-1980 01 level, though the smaller Ambassador posts are sometimes filled with 03 or 02 officers. In addition, the President appoints many non-FSO's to fill the Ambassador position at the larger and more prestigious posts around the world.

86. For the most part, the Foreign Service relies on a bottom entry career based system, with the majority of individuals entering the Service at the most junior ranks and working their way up. While a certain number of individuals do enter the Service laterally, the Service depends on junior members working their way up through the system to fill the higher ranks.

87. The newer female FSO's simply have not had the time to achieve the seniority in rank necessary to be seriously considered for ambassador slots. Testimony was offered that it takes anywhere from fifteen to twenty years before an FSO enters the higher ranks from which ambassador candidates are drawn.

88. In support of their claim of underassignment of women to the position of DCM, plaintiffs rely on their expert's analysis of assignments of men and women to high visibility senior level positions. Plais' expert analyzed six high level positions as requested by plaintiffs and determined that only in the position of DCM did a significant disparity arise. Those figures indicated that nine women were appointed DCM between 1972 and 1983, out of a total of 586 appointments. Plaintiffs' expert calculated that the expected number of women appointed during that period, based on the number of women in the grade levels

from which DCM's were chosen, is 26.8. The difference between the actual and expected number of women measures 3.54 standard deviations, which means the likelihood that this occurred by chance is 1 in 1,000.

89. This statistical analysis is of little significance in that it encompasses the period 1972 through 1983, while the relevant time period for this case is 1976 to 1983.

90. Plaintiffs' expert analyzed only those positions requested by plaintiffs, conceding he did not know if there were other high visibility positions that should have been analyzed. In addition, plaintiffs' expert illustrated a lack of knowledge as to the content of these positions, predicating his analysis solely on the assumption that the representation of the assignment should match the representation of males and females within the particular grade for which the assignment is made. Even so, the expert found no "significant" male-female difference in assignment to five of the six positions studied.

91. In view of these shortcomings in the analysis by plaintiffs' expert, the Court is not persuaded that the statistics indicate sexual discrimination. No credible evidence was presented that women had been denied assignment as Ambassador or DCM because of their sex.

92. Plaintiffs' expert presented an analysis of down-stretch and stretch assignments and concluded that at Classes 4 and 5, women are more likely to be given down-stretch assignments and men are more likely to be given stretch assignments. The presentation by plaintiffs' expert indicated that, between 1976 and 1981, 32.2% of the women in Class 4 were given down-stretch assignments, while only 17.6% of the men in that class were given down-stretch assignments. This difference measures 6.72 standard deviations, which means that there is a possibility of less than 1 in 1,000,-000 that it occurred by chance. Plaintiffs' statistics indicated that 20.8% of the women in Class 5 received down-stretch assign-

ments, while only 14.2% of the men received them. This difference measures 4.04 standard deviations, meaning that the possibility that it occurred by chance is 5 in 100,000. For officers whose personal rank is Class 7, the expert's statistics showed that women were more likely to be given down-stretch assignments to a statistically significant degree.

93. The expert's analysis also encompassed Classes 3 and 6, where no statistically significant disparity in male/female assignment to stretch and down-stretch assignments existed.

94. No attempt was made by plaintiffs' expert to relate his analysis of stretch and down-stretch assignments to the likelihood of promotion.

95. The expert's analysis, and thus the results, are faulty in several respects. First, plaintiffs' expert did not correctly tabulate the action of the Foreign Service in handing out an assignment, be it either a stretch or down-stretch assignment. The figures of plaintiffs' expert rely on an FSO being in an assignment, that is, if an FSO was in a down-stretch assignment for three years, he or she was counted three times. Such a count does not accurately reflect the actual number of assignments given out by the Foreign Service.

96. Plaintiffs' expert, by analyzing the situation class by class, appears to ignore cross-class competition for any given assignment. For example, an officer vying for a Class 4 stretch position may compete against officers from at least Classes 6, 5, 4, and 3. Plaintiffs' study apparently assumes that the only competitors for each assignment are members of the same class.

97. Plaintiffs' analysis also did not allow for the preference of the individual FSO. There was extensive testimony that down-stretch assignments are requested for various reasons, including the desire to gain an assignment with a spouse who is also a State Department employee, the so-called "tandem couple," a wish to stay state-side for a particular tour, or a desire for a particular location in the world.

98. As plaintiffs' analysis is flawed in various ways, it is of little value in persuading the Court that discrimination existed in assigning stretches and down-stretches.

99. Anecdotal evidence from both named plaintiffs and other female FSO's does not support a finding of discrimination. Alison Palmer and Marguerite Cooper, as well as other female FSO's, testified to receiving stretch assignments during their careers.

100. The evidence simply does not support any finding of sexual discrimination in assigning females to either stretch or down-stretch assignments.

101. Plaintiffs also claim women are disproportionately overassigned to out-of-cone assignments in the consular cone and underassigned to out-of-cone assignments in the Program Direction cone. In support of this position, plaintiffs produced the following results:

a) Between 1976 and 1983, 40.4 percent of all out-of-cone assignments received by women in the political cone were to consular positions, while only 15.5 percent of the out-of-cone assignments received by men in the political cone were to consular positions. This difference produces a standard deviation of 5.84, and therefore is likely to be the product of chance less than once in 1,000,000;

b) For the same time period, the plaintiffs' statistics show 22.9 percent of all out-of-cone assignments received by women in the economic cone were to consular positions, while only 11.6 percent of all out-of-cone assignments received by men in that cone were to consular positions. This difference measures 2.68 standard deviations, which is likely to be the result of chance only 5 in 1,000;

c) During the same time period, plaintiffs' analysis indicated that 50.8 percent

of all out-of-cone assignments received by women in the administrative cone were to the consular cone while only 33.2 percent of all out-of-cone assignments received by male administrative officers were to the consular cone. This difference measures 2.62 standard deviations, which is likely to be the product of chance only 5 times in 1,000 times.

102. The analysis does not account for the unique feature of FSO's bidding, or requesting, their assignments pursuant to the Open Assignment Policy. A more accurate analysis would measure the requests by the FSO's, as the observations made by plaintiffs' expert may result as much from the function of requesting different assignments as the assignment of FSO's.

103. Anecdotal evidence was received from witnesses for both parties of female FSO's receiving out-of-cone assignments to all four cones. This testimony does not support a finding of sexual discrimination.

104. The program direction cone is a prestigious senior cone to which officers can convert only after completing two tours in positions which carry the program direction skill code.

105. a) Plaintiffs produced statistics which they claim indicate that, between 1976 and 1983, 38.5 percent of all out-of-cone assignments received by men in the political cone were to senior program direction positions, while only 14.6 percent of the out-of-cone assignments received by women in the political cone were to program direction positions. This difference measures 4.46 standard deviations, which is likely to be the result of chance only once in 1,000,000;

b) Similarly, plaintiffs' statistics indicated that 12.4 percent of the out-of-cone assignments received by men in the consular cone were to program direction positions, while only 6.6 percent of the out-of-cone assignments received by women in the consular cone were to program direction positions. This difference measures 2.23 standard deviations, which is likely to be the result of chance only 2 times in 100;

c) An analysis of *all* assignments shows that 4.2 percent of men in the consular cone received assignments to the program direction positions, while 2.6 percent of the women in consular cone received assignments to the program direction positions. This difference measures only 1.66 standard deviations.

106. Defendant's expert produced an analysis indicating that, as to those men and women who did attain transfer to the Program Direction cone, there was no disparity in the amount of time spent in class before attaining the transfer. In fact, the statistics show that at Class 2 females reach the Program Direction cone faster than males. This disparity measured 3.39 standard deviations. For Classes 3 and 4, the statistics indicate females spent less time in class before progressing to the Program Direction cone, but not at statistically significant levels. A similar study measuring the total time spent in the Service before reaching the Program Direction cone also indicates that no disparity exists between men and women.

107. Defendant's analysis is not dispositive in that it measures the time in class and service of those who actually attain the Program Direction cone, and plaintiffs complain of a disparity in the number of women and men who are given out-of-cone assignments to positions which carry the program direction skill code and would thus qualify them for transfer to the Program Direction cone itself. The analysis, however, indicates that females are not discriminated against in their attainment of conversion to the Program Direction cone.

108. No credible evidence was offered by plaintiffs' witnesses that they had been denied out-of-cone assignments to the Program Direction cone or actual conversion to that cone due to sexual discrimination.

### Promotions

109. Selection Boards have been responsible for reviewing, recommending, and

rank ordering Foreign Service Officers for promotion from pre-1981 Classes 6 through 2 during the 1972 to 1983 time period. Prior to 1981 all Foreign Service Officer promotions were submitted to the White House for nomination by the President and confirmation by the Senate. As of 1981, only initial commissions as FSO's upon tenuring and promotions into and within the Senior Foreign Service are forwarded to the White House. All other recommendations for promotion are submitted to the Secretary of State for approval.

110. The number of promotions authorized at a particular grade and, where appropriate, in a particular functional field, is established by management. The Boards rank order some or all of the officers reviewed and the authorized number of promotions is made by counting down the rank order list. All officers ranked and reached for promotion who have not separated from the Service are promoted if they have not violated loyalty, security, and suitability requirements of the Service.

111. Selection Boards review the files of officers who are eligible for promotion by virtue of having met the minimum time in class eligibility requirements at a particular class level. In addition, from 1972–1980, the Boards reviewed the files of those Foreign Service Officers who were not yet eligible in order to determine whether the minimum time in class requirement should be waived in cases of exceptional performance and potential. Officers for whom such waivers were granted were ranked for promotion jointly with officers who met the minimum time in class requirements.

112. Promotion rules and criteria are set out for each Board annually in precepts which result from yearly negotiations with the exclusive employee bargaining representative, the American Foreign Service Association (AFSA). The precepts are the controlling document of the promotion process, setting out promotion criteria, competition groups, and instructions on whether all or only part of the officers are to be rank ordered. In addition, since 1979, the Selection Boards have been provided with specific voting procedures, which guide the Boards' file review, discussion, and voting procedures but not the substance of the Boards' consideration, which is controlled by the precepts. To the extent that the precepts and voting procedures do not specify any aspect of the Boards' operations or considerations, such matters are left to the individual Board's judgment.

113. The precepts direct the Selection Boards to make their evaluations of officers based exclusively on a reading of their official performance files. That file is made up of each individual's performance evaluations (including evaluations on specified forms and memoranda of performance) while in the Foreign Service, records of training completed while in the Foreign Service, records of awards, letters of commendation (to the extent submitted by the officer), recommendations for disciplinary actions, and Inspectors Efficiency Reports relating to the officer. In addition, the file may contain records of other federal employment as specified in the regulations, 3 FAM 515.2. All materials in the performance file are subject to review and comment by the employee concerned. The Director of the Office of Performance Evaluation (PER/PE) has responsibility for reviewing all evaluation material prior to its inclusion in the employee's file. As a matter of practice, since at least 1975, PER/PE has had responsibility for deleting inadmissible comments from evaluation material. However, only since March 1979, have the regulations contained specific language authorizing PER/PE to delete inadmissible comments and to substitute language, as appropriate. Employees may also seek deletions through the grievance process. In general, Boards have been instructed to emphasize the last five years' performance evaluations in making their decisions.

114. The Selection Board's ranking of officers is based on the Board's assessment of the officer's potential to perform at the next higher level.

115. Although there have been specific changes in competition groups and Selection Board procedures from year to year, as reflected in the precepts, the promotion process for members in Classes 6, 5, 4, 3, and 2 has remained essentially the same throughout the 1972–1983 time period. In addition, although the competition groups differ from class to class, the promotion process is essentially the same for each of these classes.

116. The 1946 Foreign Service Act provided that all Foreign Service Officers were to be recommended for promotion by Selection Boards. Thus from 1972 to 1980 officers appointed prior to implementation of the Career Candidate Program were promoted from Classes 7 and 8 by Selection Boards, either as probationary or non-probationary officers. In the case of probationary officers, from 1972–1975 the Selection Boards identified them as either promotable, deferred or recommended for separation. Beginning in 1976 they were identified as recommended or not recommended for promotion. For the entire period of 1972 to 1980 all probationary officers identified as promotable or recommended for promotion were promoted. Non-probationary junior officers who were recommended for promotion were rank-ordered by the Selection Boards for the period 1972 to 1975. From 1976 to 1980 they were either recommended or not recommended for promotion. The top 50% of non-probationary junior officers rank-ordered were promoted in the years 1972–1974. For the period 1975–1980 all non-probationary junior officers recommended for promotion were promoted.

117. Selection Boards are normally composed of Foreign Service Officers, members of other Foreign Affairs agencies, and at least one outstanding private citizen or public member. Since June 1973, at least 60% of the members of Selection Boards below the level of Career Minister were required to be members of the Foreign Service. FSO's on Selection Boards, so far

as possible, have a personal rank at least one class higher than the employees being rated. No person may serve on a Selection Board for two consecutive years.

118. Under a June 29, 1973 agreement with AFSA, the Department of State is required to submit a list of potential candidates for Selection Board membership to AFSA before the convening of the first Board.

119. The Foreign Service Act of 1980 introduced the specific requirement that Selection Boards include women and minorities. This codified the Department's practice of prior years of seeking to include such members on the Boards whenever possible.

120. Selection Boards generally consider officers for promotion in Classes 6, 2, and 1 on a class-wide basis, and in Class 3 on both a class-wide and on a cone specific basis. In Classes 5 and 4, FSO's compete for promotion on a cone specific basis.

121. Time spent in a given class is an important element in the promotion process. The precepts generally set forth minimum time-in-class requirements before an officer is even eligible for consideration for promotion.

122. From 1976 through 1980, a "zone merit" system was in effect for officers at Classes 5 and 4. This system provided 80% of promotions to officers with greater seniority in class while, at the same time, ensuring that 20% of the promotion opportunities were available for rapidly moving, outstanding officers.

123. The Selection Boards determine the relative importance of any trait or competency at a particular level. They develop an overall impression of each officer's strengths and weaknesses relative to the group as a whole, and use that impression to score the individual.

124. There is no evidence that women were disadvantaged in overall performance from Classes 8 to 7, Classes 7 to 6, Classes 4 to 3, Classes 3 to 2, or Classes 2 to 1.

125. The Court finds no significance in plaintiffs' analysis showing that in the years 1978, 1979, and 1980, in which two sessions of the Class 6 Selection Boards met to consider promotions to Class 5, the first sessions underpromoted women while the second sessions overpromoted them. Not only is the methodology used to arrive at these results questionable, but the overall statistics for each year show no disparity reflected in the promotion rates of women versus men. Defendant provided a study showing that there was no difference in time from entering Class 6 to entering Class 4, based on first or second board promotion, thus showing no harm to those women promoted in the second session.

126. The heart of plaintiffs' promotion claim is that females face a barrier at Class 5 to their promotion to Class 4. The most credible analysis by plaintiffs, a logistic regression controlling for sex, time in class, cone, and allowing the effect of time in class to differ by cone, produced results indicating that between 1976 and 1983 women eligible for promotion in Class 5 were significantly less likely to be promoted than men. The probability that these results would exist as a product of chance is less than 4 percent.

127. Plaintiffs presented a further series of analyses which purported to support their position, all of which relied upon grade at hire. Plaintiffs' calculation of grade at hire was flawed and unreliable, however, and the results have no significance. In addition, these same analyses suffered from aggregation problems arising from attempting to obtain summary results from year-by-year surveys.

128. The only credible analysis offered by plaintiffs was the logistic regression (PX 103B).

129. Defendant presented an analysis, a conditional logit accounting for time in class, which, for the period 1975–1983, showed a discrepancy between the promotion rates from Class 5 for females and males, but the standard deviation measured only 1.76.

130. Plaintiffs' expert, using the same conditional logit method but applying it to his data, calculated that the difference between male and female promotions for the period 1976–1983 measured 1.88 standard deviations. Though the data base of plaintiffs' expert is questionable, his results indicate that defendant's statistics for 1975 to 1983 are indicative of those which would have resulted for the 1976–1983 period. Indeed, the 1975 figures are probative of the issues in this case.

131. Time in class is the proper variable for explaining the apparent disparity of promotions of females from class. It is clear from the testimony that females are newer in the Service and have less time in each class.

132. While each expert had different data bases leading to different conclusions on many issues, these differences are irrelevant when comparing plaintiffs' logistic regression (PX 103B) with defendant's conditional logit. (Table 1, Model 2 of DX 8A).

133. Defendant's conditional logit more accurately accounts for the promotion system used by the Foreign Service than does plaintiffs' use of a logistic regression analysis. Plaintiffs' own expert admitted to this conclusion.

134. The significance of these results at Class 5, whether looking at plaintiffs' finding of 1.88 standard deviations or defendant's 1.76, is lessened considerably as those analyses look only at one class. Plaintiffs' expert admitted that, as to Class 4 and above, the probability of selection for promotion appears to be the same for males and females. Defendant's conditional logit supports this position. In addition, plaintiffs made no claim of discrimination in promotion at Classes 7 and 8.

135. When using Model 2 of the conditional logit (DX 8A, Table 1), the figures illustrate that, over Classes 1 through 6, the disparity of promotion between males and females measures only 1.13 standard deviations—a statistically insignificant difference.

136. No credible anecdotal evidence was offered by any female FSO of being denied promotion from Class 5 to Class 4 because of sexual discrimination.

### Equal Employment Efforts by the Department of State

137. The Department of State had made sincere efforts during the period of this lawsuit (1976 to present) to improve the status of women in the Foreign Service and has successfully responded to many individual and class-wide grievances of female FSO's.

138. In 1975 the Department instituted an interim affirmative action Mid-Level Program, designed to increase the number of women and minorities at the mid-level. By 1986, it is estimated that over 100 women will have been appointed. The program is being phased out because these mid-level appointments affect the opportunities of those entering at the bottom levels. Furthermore, many bottom level entrants are moving up to the mid-level.

139. The Department of State has on numerous occasions issued directives stating that female FSO's were to be treated identically to their male counterparts and that posts abroad could not maintain different protocol standards for male and female FSO's.

140. The Department of State has on two occasions made studies of the status of women and minorities, in 1977 with the "Executive Level Task Force on Affirmative Action" and in 1979 the "Habib Committee." Many of the recommendations, which included concerns about recruitment, appointment of more women to executive level positions, and review of the FSO written examination, were implemented.

### Conclusions of Law

1. Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, prohibits discrimination in employment on the basis of sex:

a) It shall be unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex ...

42 U.S.C. 2000e–2(a).

2. Generally, Title VII cases consist of two types, those which involve "disparate treatment" and those which involve "disparate impact." *Teamsters v. U.S.*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

3. Disparate treatment is the intentional "treat[ment of] some people less favorably than others because of their race, color, religion, sex or national origin." *Teamsters*, 435 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15.

4. In a disparate treatment case, [p]roof of illicit motive is essential, but, especially in cases alleging class-wide discrimination, illicit motive may be inferred from a sufficient showing of disparity between members of the plaintiff class and comparably qualified members of the majority group.

*Segar v. Smith*, 738 F.2d 1249, 1265–66 (D.C.Cir.1984), *cert. denied sub nom.,* — U.S. ——, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985) (citing *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15).

5. A disparate impact case involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Segar*, 738

F.2d at 1266 (quoting *Teamsters,* 431 U.S. at 336 n. 15, 97 S.Ct. at 1855 n. 15).

■ 6. In either type of Title VII litigation, plaintiff must initially establish a prima facie case. *Teamsters,* 431 U.S. at 558, 97 S.Ct. at 1866; *Segar,* 738 F.2d at 1267.

■ 7. Plaintiffs may establish a prima facie case by statistics alone, if compelling. *Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977).

■ 8. Plaintiffs' statistical analysis "must yield results that meet generally accepted standards of statistical significance ... [B]oth the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Segar,* 738 F.2d at 1274.

■ 9. Plaintiffs' statistical analysis must take into account minimum objective qualifications for the positions at issue. *Segar,* 738 F.2d at 1274.

■ 10. Anecdotal evidence is not an absolute requirement to carry plaintiffs' burden. Such testimony, however, which can "br[ing] the cold numbers convincingly to life," *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856, "might bolster a plaintiff's case or reduce the need for strong statistical proof ..." *Segar,* 738 F.2d at 1278. "Absent anecdotal evidence, an inference of discrimination is less secure when ... statistics show only slight disparities." *Segar, id.*

■ 11. A defendant may challenge "the integrity of plaintiffs' statistical methodology and the significance of the results shown. Often the defendant will supplement the critique [of plaintiffs' statistics] with alternative statistical analyses tending to refute the plaintiffs' evidence of disparity." *Segar,* 738 F.2d at 1268. "[T]he most effective way to rebut a prima facie case is to present more accurate statistics." *Se-gar,* 738 F.2d at 1287 (quoting *Trout v. Lehman,* 702 F.2d 1094, 1102 (D.C.Cir. 1983)), *rev'd,* —— U.S. ——, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984).

■ 12. In presenting its own statistical case, defendant "need not carry the burden of persuasion as to the nonexistence of a disparity ..." *Segar,* 738 F.2d at 1268. If a disparate treatment claim is raised, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 1284 (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). If the claim is one of disparate impact, "the plaintiffs must persuade the trier of fact that a disparity exists." *Se-gar,* 738 F.2d at 1268. The standard of proof imposed on plaintiff for either type Title VII case requires a showing "by a preponderance of the evidence." *Id.*

■ 13. After a case has been fully tried on the merits, the issues of establishing a prima facie case and rebuttal by defendant are applicable only in "the allocation of burdens and order of presentation of proof." *Mitchell v. Baldrige,* 759 F.2d 80, 83 (D.C.Cir.1985). The question of whether plaintiff has established a prima facie case "is no longer relevant" after being fully tried. *Mitchell, id.* (quoting *United States Postal Service v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983)). "[T]he trier of fact must ... decide whether plaintiffs have met the ultimate burden of persuasion that the law imposes on them." *Segar,* 738 F.2d at 1286.

14. The Court adopts the .05 level for establishing that a study is statistically significant. *See Segar,* 738 F.2d at 1282–83. This means that there is a possibility of 5 in 100 that the result is due to chance. The .05 level generally corresponds to 1.65 standard deviations.

15. In this case, plaintiffs first had consultation with an EEO counselor in June

1976. The proper period for statistical examination by the Court is 1976 to 1983, the last year for which data was available. In reaching its overall decision, the Court has analyzed the years 1976 to present.

### Grade at Hire

■ 16. Plaintiffs' statistical analysis of grade at hire of FSO's entering the Foreign Service in 1976–1977 produced no statistically significant disparities between males and females and no credible testimony was presented to support plaintiffs' claim. Plaintiffs have failed to prove that defendants discriminated against females in grade at hire.

### Awards

■ 17. Plaintiffs' statistical analysis of a narrow segment of State Department awards produced unconvincing results, utilized faulty assumptions in methodology, and was unsupported by credible evidence. The Court finds that defendant did not discriminate against female FSO's in the granting of awards.

### Assignments

18. Plaintiffs presented no convincing evidence that female FSO's were denied access to job assignments in certain geographic regions of the world. Defendant produced credible testimony that female FSO's are given assignments equally with their male counterparts and have served with distinction.

19. Plaintiffs' analysis of the number of women in Ambassador and DCM positions failed to adequately consider the bottom-entry nature of the Foreign Service. It failed to allow for the time necessary for the large number of female FSO's presently in the Service to advance to the higher ranks.

20. The analysis as to DCM positions is unconvincing in that in only 1 of 6 high visibility positions was a statistically significant disparity between males and females found.

21. Plaintiffs' analysis on stretch and down-stretch assignments improperly tabulated the total assignments, ignored cross-class competition, and did not control for preference, a significant aspect of the Open Assignment System.

22. Testimony from the various witnesses of out-of-cone assignments to all four cones and the failure to allow for the preference of FSO's built into the Open Assignment Policy lessens the significance of plaintiffs' analysis of out-of-cone assignments. The Court finds this analysis unconvincing.

■ 23. The Court concludes that plaintiffs have failed to establish sexual discrimination in the job assignments of female FSO's.

### Evaluations

24. Plaintiffs failed to prove through the use of anecdotal evidence that the 1974 OER was discriminatory to female FSO's.

25. In view of the finding that female FSO's are promoted equally with males and given the same job opportunities, the Court finds that plaintiffs' analysis of the disparity on potential ratings does not establish that the OER's of female FSO's are discriminatory in any fashion.

■ 26. The Court finds no discrimination against female FSO's in the evaluation of their job performances.

### Cone at Entry

■ 27. Plaintiffs' analysis presented no basis for a finding of disparate treatment in the assignment of females to either the consular or political cones. Plaintiffs' statistical findings in large part included those lateral entrants who had the opportunity to choose their cone assignments. This portion of the analysis has been discredited and the Court finds there has been no disparate treatment of female FSO's.

28. Plaintiffs identify the functional field test as a facially neutral employment practice resulting in an adverse impact on the assignment of FSO's to the four cones. This claim applies only to exam takers, and is inapplicable to non-exam takers. The statistics used to support this claim were flawed and inconclusive. The Court finds that plaintiffs have failed to establish any disparate impact as a result of the functional field test.

### Promotions

29. As already indicated, the Court finds that no discrimination against female FSO's exists in the promotion process of the Foreign Service. Plaintiffs' statistical analysis produced not only unconvincing results in Classes 5 and 6 promotions, but concluded that discrimination did not exist in any other classes. The low statistical significance, when allowing for time in class, generated by defendant's analysis and replicated by plaintiffs' expert for the appropriate time period, in conjunction with the lack of anecdotal evidence of discrimination, leads to the conclusion that no discrimination existed.

30. The evidence has demonstrated that, both prior to and throughout the pendency of this lawsuit, the Department of State has been committed to eliminating any barriers to the full participation of female FSO's in the Foreign Service. The Department of State has made every reasonable effort to remove any vestiges of sexual discrimination from the operation of the Foreign Service. It should be commended for those efforts.

### Conclusion

The Court finds that plaintiffs have failed to show by a preponderance of the evidence any sexual discrimination by the State Department.

Accordingly, judgment will be entered for the defendant and this case dismissed.