Alison **PALMER**, et al., Plaintiffs,

v.

**George P. SHULTZ, Defendant.**

**Marguerite COOPER**, et al., Plaintiffs,

v.

**George P. SHULTZ, Defendant.**

**Civ. A. Nos. 76–1439, 77–2006.**

United States District Court,
District of Columbia.

July 2, 1987.

Ellen K. Wayne, Karen Edgecombe, Terris, Edgecombe, Hecker & Wayne, Washington, D.C., for plaintiffs.

Stuart Newberger, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN LEWIS SMITH, Jr., District Judge.

These consolidated cases involve a class action filed against the Department of State alleging sexual discriminatory practices against female Foreign Service Officers (FSO's) and FSO applicants in various aspects of employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1972 to cover employment discrimination in the federal government. *See* 42 U.S.C. § 2000e *et seq.* The plaintiff class is composed of all female FSO's employed by the Department of State at any time since February 4, 1976 and all female applicants to become FSO's since February 4, 1976.[1] The individual plaintiffs are Alison Palmer, Mary A. Ryan, Ellen Shippy, Marguerite Cooper, Mary Lee Garrison, Mary Finrow, Laurel Cooper, Mary Hartman, and Julie Ann McGrath.

In particular, the plaintiffs alleged sexual discriminatory practices in: (1) hiring, (2) assignments, (3) promotions, (4) performance evaluations, (5) awards, and (6) class at hire. Plaintiffs' hiring claims were settled prior to trial.[2] Trial on the remaining claims was bifurcated into liability and remedy phases. Following the liability phase of the trial, the District Court entered judgment for the defendant and dismissed the plaintiffs' remaining claims on the ground that no unlawful discrimination had occurred. *Palmer v. Shultz,* 616 F.Supp. 1540, 1561 (D.D.C.1985).

The plaintiffs appealed the District Court's decision on seven Department of

---

1. The class does not include individuals who have opted out of the suit pursuant to Federal Rule of Civil Procedure 23(c)(2) nor does the certified class include FSO's serving the Agency for International Development, the United States Information Agency, the Foreign Agricultural Service or the Foreign Commercial Service.

2. The hiring claims were settled with two consent decrees. The first, entered on October 12, 1983, resolved the claims of Junior Applicant class members. The second, entered on March 5, 1985, settled the hiring claims of the Mid-Level Applicant class members.

State personnel practices challenged at trial: (1) promotions from class 5 to class 4, (2) "potential" evaluations, (3) "out-of-cone" assignments, (4) "stretch" and "down-stretch" assignments, (5) Deputy Chief of Mission assignments, (6) Superior Honor Awards, and (7) "initial cone" assignments. In March 1987, the Court of Appeals reversed this Court's decision on these issues and remanded for further proceedings based on the existing record. *Palmer v. Shultz,* 815 F.2d 84 (D.C.Cir. 1987).

Therefore, upon consideration of the entire record herein and in accordance with the Court of Appeals March 1987 opinion, the Court enters the following findings of fact and conclusions of law regarding the seven personnel issues raised on appeal.

## FINDINGS OF FACT

1. The Foreign Service of the United States is charged with assisting "the President and the Secretary of State in conducting the foreign affairs of the United States." 22 U.S.C. § 3901(a)(1), § 3904.

2. The Foreign Service is administered by the Secretary of State under the direction of the President. 22 U.S.C. § 3921(a).

3. While performing its many varied duties through the world, the Foreign Service is responsible for maintaining the best possible relations with the government to which accredited.

### *Cone at Entry*

4. Prior to the 1960's, FSO's were hired as generalists although many but not all developed a field of specialization later in their careers. In the early 1960's, the Department decided that Foreign Service Officers should be selected for hire into a particular cone, that is, functional field of specialization, while continuing to be required to show a generalist aptitude because the generalist selection method had resulted in a surplus of political and political/economic officers and an insufficient number of officers in the other fields. In addition, management believed that more specialized expertise was required to meet the increas-ingly complex demands placed on the FSO corps.

5. Four "cones" of specialization were established:

(a) Administrative officers are responsible for support operations of U.S. embassies and consulates.

(b) Consular officers work closely with the public providing assistance to American travelers and residents abroad, issuing visas, and other immigration related issues.

(c) Economic officers deal with economic issues that impact on U.S. interests, including trade, energy, aviation, and maritime matters. These officers perform their duties by both gathering and reporting data back to the U.S. and by taking part in economic negotiations with foreign entities.

(d) Political officers analyze and report on political questions which affect U.S. interests. They gather data to report back to the U.S. while also maintaining close contacts with foreign political and labor leaders.

6. Since establishment of the cone system, officers have been assigned to a cone at the time of hire. The officer's cone is reflected as the officer's primary skill code. A cone may include individuals with a number of different primary skill codes. For example, political officers, political-military affairs officers, and labor-political affairs officers all constitute different skill codes, yet all are within the political cone.

7. Since the institution of cones in the early 1960's, it has not been the policy of the Department to encourage FSO's to change cones. This is due to the fact that recruitment and appointment have been conducted by cone, in accordance with, *inter alia,* anticipated work-force needs. If substantial numbers of officers changed cones, this could result in the imbalances which had previously existed. Except for a short period from mid–1977 to mid–1978 when there was a freeze on cone changes, however, a procedure has existed which specified certain prerequisites for changing cones.

8. For the period 1971 through mid-1977, an officer who wished to change cones would request his/her Career Development Officer (CDO) to make the change. That CDO would consult with the CDO for the desired cone, the two CDO's would consider the officer's performance in out-of-cone assignments in the desired cone and any other relevant credentials (*e.g.*, academic background). If they agreed that the officer would be competitive in the desired cone, they would recommend the change to the interfunctional assignments panel, which had the final responsibility for approving the change.

9. New procedures were adopted in June 1978 (Department Notice: Primary Skill Code Changes, June 8, 1978) which permitted cone changes under certain specified circumstances. Those procedures were in effect until May 1979.

10. New procedures were again adopted in May 1979 (Department Notice: Procedures for Primary Skill Code Changes, May 22, 1979). Those procedures have been in effect since that time and continue to constitute the only method available for changing cones.

11. The majority of FSO's enter the Foreign Service pursuant to the written and oral examination process. Beginning with the 1975 written examination, candidates were tested in all four functional fields on the written examination.

12. Between 1975 and 1979, the Junior Officer Division of the Foreign Service Career Development and Assignment Office of the Bureau of Personnel (FCA/PER) was responsible for the conal assignment of junior officers. FCA/PER would review each candidate's file, looking at his or her academic and work experience, written and oral examination results, and stated conal preference, if any. Based on this review, FCA/PER would select a cone for the candidate. If a candidate disagreed with the conal designation, he or she was free to discuss the option of obtaining a different designation.

13. Those FSO's who entered the Service pursuant to the lateral entry programs acquired cone designations as part of the lateral entry process. Lateral entry applicants themselves selected, in advance, the functional field in which they wished to compete and were evaluated only for that specific cone.

14. Candidates attempting entry into the Foreign Service pursuant to the Affirmative Action Junior Officer Program (AAJOP) and Mustang Program obtained their initial cone assignments in a manner similar to other junior officers in that the Foreign Service Career Development and Assignment Office (FCA) matched the applicant's background and experience with the requirements of the four functional fields. In addition, since 1984, AAJOP applicants must also take the written examination.

15. Beginning in 1980, candidates who pass the written examination, the assessment process, and the remaining steps of the selection procedure are placed on rank-order registers for all cones for which they passed the corresponding functional field test in the written examination. Actual offers of appointment are made in rank order, with the person who has the highest score on any conal register being offered the first appointment.

16. Candidates are free to accept or decline an offer, but are not guaranteed that a subsequent offer will be made, either in the same cone or in any other cone in which the candidate is eligible. If a candidate is reached on more than one register in advance of a convening of a given initial training course, he or she may choose the cone of appointment.

### Use of Statistics

17. A statistical disparity between the selection rates of men and women for a particular job or job benefit has one of three possible causes: 1) unlawful discriminatory animus, 2) legitimate and non-discriminatory cause, or 3) the disparity may simply be a product of chance. *Palmer*, 815 F.2d at 90–91. A statistical analysis of a disparity in selection rates can reveal the probability that the disparity is merely a random deviation from perfectly

equal selection rates. Statistics, however, cannot entirely rule out the possibility that chance caused the disparity. Nor will they be reliable if not accurately drawn or focused on a proper labor pool.

18. The terms "one-tailed" or "two-tailed" refer to the "tails" or ends of a bell-shaped curve which represents in graph form a "random normal distribution." The area under any segment of the bell curve measures the probability of that range of results occurring randomly. The percentage area underneath the bell curve within one standard deviation distance from the mean of a normal distribution is always the same for normal distributions. Thus, the probability of a result randomly occurring that measures within one standard deviation of the distribution (either greater or lesser than the mean) is the same for all normal distributions: 68.26%. *Palmer*, 815 F.2d at 93.

19. But for every deviation from the mean of a normal distribution measured in a certain number of standard deviations, there are two distinct ways of referring to the probability of that result occurring randomly. If fewer women than men were selected for a particular job and this disparity measures 1.96 standard deviations, we can ascertain the probability that women by chance would be underselected to this extent or greater. This probability corresponds to the area between 1.96 standard deviations and the end of the bell curve representing underselection of women. Standard statistical tables reveal that this probability is only 2½% on this "one-tailed" test.

20. However, if a disparity of 1.96 standard deviations is viewed as the probability that there was either an underselection or an overselection of women, that disparity corresponds to the area under the bell curve between 1.96 standard deviations and both extremes of the curves. This "two-tailed" approach equates to a probability of 5% that women were underselected or overselected.

### Awards

21. The Department of State administers an Incentive Awards Program for the Foreign Service. Plaintiffs' expert analyzed one segment of the Department's program, the Honors Awards, which includes the Distinguished Honor Award, the Superior Honor Award, and the Meritorious Honor Award.

22. "Honor Awards recognize outstanding achievement and bestow singular honor and official recognition to an individual or group. As appropriate, honor awards may be supplemented by a cash payment or meritorious service or quality increase, if the employee is nominated for such increase." 3 FAM 642.2.

23. Plaintiffs' expert analyzed the three awards by sex for the period 1976 to 1983. The statistics show no statistically significant disparity between the number of men and women receiving either the Distinguished Honor Award or the Meritorious Honor Award.

24. In regards to the Superior Honor Award, plaintiffs' expert produced statistics indicating that 4.8% of the award recipients were females, although 10.1% of the class 1 through 5 FSO's during the time period were females. These results indicate that twice as many women would be expected to receive the Superior Honor Award as actually received it. The difference measures 3.1 standard deviations and would occur as a product of chance in a non-discriminatory system only 1 time in 500 (two-tailed).

25. Defendant has presented no statistical evidence related to plaintiffs' showing of discrimination in awards.

### Assignments

26. Plaintiffs claim that women have been disproportionately overassigned to the consular cone and underassigned to the political cone during the relevant time period, 1976–83, as a result of the disparate impact of the political functional field portion of the Foreign Service Entrance Examination.

27. Plaintiffs' statistics, based on information provided on computer tape by the Educational Testing Service (ETS), indicate

that, when examining those FSO's who entered the Service between 1975 and 1980 through the normal exam procedures, 16.9 more females were assigned to the consular cone than might be expected based on their proportion among FSO hires. This difference measures 2.99 standard deviations.

28. During the same 1975–80 time period, again looking only at those FSO's who entered the Service through the exam procedures, plaintiffs' expert, relying on the same ETS data, found that 17.6 fewer females were assigned to the political cone than would be expected based on their proportion among FSO hires. This difference measures 3.29 standard deviations.

29. Plaintiffs' expert discounted the level of educational attainment at hire and educational major as explanations for the discrepancy in cone assignments of exam applicants.

30. Plaintiffs' expert contended that the scores received by candidates on the four functional field tests of the Foreign Service written examination differed by sex and were related to cone assignment. The scores from the 1975–80 written examination indicated that women hired between 1976 and 1983 had significantly lower average scores on the political functional field test than men, but that the average score of men and women on the consular functional field test was about equal.

31. A logistical regression performed by plaintiffs' expert on the cone assignment of those persons who took the 1975–80 written examinations and were hired between 1976 and 1983, which took into account the effect of level of educational attainment, major field of study, sex, and functional test scores on cone assignments, indicates that test scores substantially explain cone assignments. When allowing for the functional field test scores, the analysis indicates no statistically significant disparity in assignment of females and males to the consular cone. As to assignment to the political cone, the disparity measures only 1.66 standard deviations.

32. The plaintiffs produced no statistical analysis regarding the disparate impact of the examination on women other than those who took the examinations between 1975 and 1980 and were subsequently hired between 1976 and 1983.

33. The accuracy of the ETS data on which the plaintiffs' statistical analysis was based was not challenged by the defendant.

34. On the 1973 and 1974 examinations, a candidate selected one functional field test for which she wished to be considered for appointment to the Service. Beginning in 1975, all FSO's were required to take all four functional field tests.

35. FSO candidates were not asked for their conal preferences after 1974. However, if a conal preference was given by the applicant, the preference was considered along with the candidate's academic and work experience and written and oral examination results when assignments were made. If the candidate disagreed with the conal designation, he or she was free to discuss the option of obtaining a different designation.

36. Defendant contends that women have a preference for the consular cone which explains the disparities in cone assignments.

37. Defendant's expert indicates that the government's preference study which is based on the preferences of women who were hired between 1976 and 1983 and who took the 1973 or 1974 examination documents a pattern of conal preference for FSO's in 1973 and 1974 which, when projected for 1975–1983, establishes that female FSO's were proportionately overassigned to the political cone in relation to their preferences during 1975–83.

38. The defendant's preference analysis is not persuasive. None of the FSO's included in the plaintiffs' proof are covered by the defendant's study. Instead, the defendant attempts to establish the preferences of 1975–80 test takers by relying on projections based on a preference study based on 1973–74 test takers. However, these projections are of doubtful relevance to defendant's argument because the 1973–74 test takers were allowed to select only one of four functional fields in which to be

tested and the 1975–80 test takers were required to test in all four fields. As a result, the preferences of the 1973–74 test takers were "pre-test" preferences which may or may not have been influenced by the applicant's perception of the relative difficulty of testing and subsequent assignment in the political or consular cones. Nonetheless, they are probably somewhat relevant if used to establish the expected "pre-test" preferences of the 1975–80 applicants. However, projections on 1973–74 "pre-test" preferences are not relevant to establishing the "post-test" preferences on which defendant must rely in order to show that the disparity in 1976–1983 consular and political assignments of women resulted from a disparity in assignment preferences. The defendant relies on this Court's finding that although conal preferences were not solicited after 1974, a stated conal preference, if any, was considered along with academic and work experience as well as test scores when assignments were made to establish that preferences were a substantial factor in the assignment process. However, this volunteered preference would necessarily be a "post-test" preference, one made after taking into account the results of the entrance examination, including the political functional field portion which the plaintiffs challenge as having disparate impact. This "post-test" preference is necessarily tainted if the test is an illegal one. Even if the defendant had introduced a favorable statistical correlation between 1975–80 "post-test" preferences of women and 1976–83 assignments of women to the political cone, that showing would do nothing to rebut a finding of discrimination based on the plaintiffs' showing of disparate impact in the examination because the challenged test would have had a direct hand in determining the "post-test" preferences on which the defendant would be relying. Indeed, if the disparate impact of the functional field portion of the test were so extreme that 100% of the women taking it did extremely poor-. ly, it is conceivable that 100% of the women taking that test would prefer to not be assigned to that cone. It is reasonable to assume that the defendant would grant those requests because of the low scores. However, it is illogical to conclude that it was preference rather than the disparate impact of the test which resulted in those assignments. In the same vein, the defendant could not rely on hypothetical "pre-test" preferences based on the 1973–74 study to establish that preference accounted for the assignment disparity without a showing that there was a direct correlation between "pre-test" preferences and "post-test" assignments. Not only did the defendant not even request preferences from its 1975–80 applicants but any preferences which were volunteered were "post-test" preferences and even they did not play a substantial role in determining assignments to the political cone.

39. Defendant did not rely on a showing that the political functional field test was job related.

40. FSO's hold a personal rank (class). In addition, each position that an FSO might hold is classified as being at a certain grade level or rank. FSO's can be assigned to positions which are above or below their personal rank.

41. Each position that an FSO might hold is either classified as being within one of the four main cones or as an "inter-functional" position. FSO's are generally assigned to positions within their own cone, although "out-of-cone" assignments are permitted.

42. FSO's are assigned to new positions on a frequent basis, generally every two to three years. These changes in job assignments almost always entail changes in duties and frequently, changes in location. Each such assignment becomes a part of the officer's employment record.

43. FSO's are required by law to be available for service worldwide. While serving overseas, FSO's may be assigned to one of approximately 260 posts located around the world or they may be detailed to other United States government agencies, international organizations, or private sector organizations. While in the United States, FSO's may be assigned to positions within the Department of State, detailed to

other federal agencies, assigned to training or loaned to state or local governments.

44. Since 1975, FSO assignments have been subject to the Open Assignment Policy as set forth in Standard Operating Procedures, No. A–1 (revised 1/14/77) and Standard Operating Procedures, No. A–1 Addendum (revised 1/7/77), recently superseded by Standard Operating Procedures, No. A–1 (approved 9/83).

45. Under the Open Assignment Policy, all position vacancies are advertised in advance to all employees through worldwide cables permitting everyone to "bid" on the positions they desire. Officers, as they are due to complete their assignments, send a bid list of their preferences to their CDO. These preferences are consolidated for each available position and presented to the appropriate regional or functional bureau in the form of a "bid book," which lists all positions and the name of all bidders. Assignment officers, who represent the interests and preferences of the geographic and functional bureaus in which the positions are located, receive recommendations of candidates from the bureaus. In developing their recommendations, the bureaus review the list of bidders and solicit information about them from persons working inside or outside the bureau. The bureau preferences are transmitted by the assignment officers to the CDO's, who then submit lists of candidates to assignment panels. Assignment panels are composed of CDO's and assignment officers.

46. Since 1975, the assignment procedures have tended to increase the authority of the central personnel system, and have provided the bureaus and posts much influence over the assignment of officers.

47. In addition to the formal procedures for assignments described above, officers often "work the system," that is, use the influence of their former colleagues and supervisors to make themselves better known to the bureaus and posts in order to obtain the assignments they desired. No testimony was presented that these informal procedures, in themselves, discriminated against female FSO's. To the contrary, several of plaintiffs' witnesses testi-

fied that they had worked the system successfully to obtain their positions.

48. Officers are free to bid on any position compatible with their class and the completion date of their current tour, though FSO's are not permitted to bid on positions more than two classes above or below their present class. Assignments to positions above the officer's personal grade are known as "stretch" assignments and are highly sought since employees generally anticipate that if they perform effectively in a position rated above their present grade, their chances for promotion are considerably enhanced. "Down-stretches," assignments below an officer's personal class, are also possible. Stretch and down-stretch assignments are always made with the concurrence of the individual officer. Simply because an officer bids on a stretch or down-stretch assignment does not mean he or she will receive the assignment.

49. For the most part, the Foreign Service relies on a bottom entry career based system, with the majority of individuals entering the service at the most junior ranks, and working their way up. While a certain number of people do enter the Service laterally, the Service depends on junior members working their way up through the system to fill the higher ranks. Testimony has been offered that it takes anywhere from fifteen to twenty years before an FSO enters the higher ranks from which ambassador candidates are drawn.

50. In support of their claim of underassignment of women to the position of DCM, plaintiffs rely on their expert's analysis of assignments of men and women to high visibility senior level positions. Plaintiffs' expert analyzed six high-level positions and determined that only in the position of DCM did a significant disparity arise. Those figures indicated that nine women were appointed DCM between 1972 and 1983 out of a total of 586 appointments. Plaintiffs' expert calculated that the expected number of women appointed during that period, based on the number of women in the grade levels from which DCM's were chosen, was 26.8. The difference between the actual and expected number of women

measures 3.54 standard deviations which means that the likelihood this occurred by chance is 1 in 2,500 (two-tailed). Plaintiffs' expert analyzed only those six positions requested by plaintiffs, conceding he did not know if there were other high-visibility positions that should have been analyzed. The expert found no significant male-female disparity in assignment to five of the six positions studied.

51. Defendant has asserted that plaintiffs' statistical evidence is insufficient because there was no significant underappointment of women to other high-visibility positions.

52. Defendant has claimed plaintiffs' statistical evidence is flawed because it was based on the time period between 1972 and 1983 rather than the period between 1976 and 1983. However, defendant has failed to show that the disparity would not exist if the 1972 to 1975 data were excluded.

53. Defendant has claimed that women were underappointed to DCM positions because they were appointed to Ambassador positions instead. However, defendant rests this argument on the single-sentence testimony of one witness, Andrew Steigman, which was conjectural and inconclusive.

54. Plaintiffs claim that women of classes 4, 5, and 7 were more likely to be given down-stretch assignments during 1976 to 1981 and that men of the same classes were more likely to be given stretch assignments during the same period. Plaintiffs' statistics indicated that between 1976 and 1981, 32.2% of the women in class 4 were given down-stretch assignments while only 17.6% of the men in that class were given down-stretch assignments. This difference measures 6.72 standard deviations which means that there is a possibility of less than once in ten billion that this great a discrepancy would occur by chance (two-tailed). Conversely, only 19.1% of women in class 4 received stretch assignments during this period, whereas 28.4% of the men in class 4 did. This underselection of women measures 3.74 standard deviations which means that the probability of either an underselection or overselection of women of this magnitude or larger resulting from chance is about one in 5,000 (two-tailed).

55. Plaintiffs' statistics also indicated that women in class 5 were also more likely to be given down-stretch assignments and men were more likely to be given stretch assignments. Between 1976 and 1981, 20.8% of the women in class 5 received down-stretch assignments, while only 14.2% of the men received them. This difference measures 4.04 standard deviations, which means that the possibility that this great a discrepancy occurred by chance is 1 in 20,000. Conversely, only 31.6% of women in class 5 did receive stretch assignments during this period whereas 37.7% of the men did. This disparity measures 2.79 standard deviations, which means that the probability that this great a discrepancy occurred by chance is 0.52% (two-tailed).

56. For officers whose personal rank is class 7, women are more likely to be given down-stretch assignments than men. Between 1976 and 1981, 19.9% of the women in class 7 received down-stretch assignments whereas only 14.3% of the men in class 7 did. This disparity measures 2.39 standard deviations, which corresponds to a probability of 1.6% (two-tailed).

57. Defendant claimed that plaintiffs' statistics showing disparities between men and women in stretch and down-stretch assignments were flawed because the data from which the statistical analysis was made was tabulated in terms of the total number of years each FSO served rather than in terms of the number of such assignments. However, defendant failed to introduce evidence showing that the imperfections of the data caused the disparities produced by the statistical analysis. In addition, the data plaintiffs used was based on defendant's interrogatory answers, the only information on stretch and down-stretch assignments available to plaintiffs from defendant's employment records.

58. Defendant claimed that female FSO's are not discriminated against in down-stretch assignments because women prefer down-stretch assignments. However, defendant presented only isolated and

inconclusive instances of individual testimony which did not establish a sufficient basis for undermining the probative weight of the statistics.

59. Plaintiffs claim women are disproportionately overassigned from the economic, political and administrative cones to out-of-cone assignments in the consular cone and underassigned from the political and consular cones to out-of-cone assignments in the Program Direction cone. In support of this position, plaintiffs produced the following statistics:

a) Between 1976 and 1983, 40.4% of all out-of-cone assignments received by women in the political cone were to consular positions, while only 15.5% of the out-of-cone assignments received by men in the political cone were to consular positions. This difference produces a standard deviation of 5.84, and therefore is likely to be the product of chance less than once in one hundred million (two-tailed);

b) For the same time period, the plaintiffs' statistics show 22.9% of all out-of-cone assignments received by women in the economic cone were to consular positions, while only 11.6% of all out-of-cone assignments received by men in that cone were to consular positions. This difference measures 2.68 standard deviations, which is likely to be the result of chance only .74% of the time (two-tailed);

c) During the same time period, plaintiffs' analysis indicated that 50.8% of all out-of-cone assignments received by women in the administrative cone were to the consular cone while only 33.2% of all out-of-cone assignments received by male administrative officers were to the consular cone. This difference measures 2.62 standard deviations, which is likely to be the product of chance only .88% of the time.

60. Defendant claimed that out-of-cone assignments were made as a result of an officer's preference, not sex. However, defendant presented no evidence that more women than men preferred out-of-cone assignments to the consular cone.

61. Defendant has provided no other rebuttal evidence concerning out-of-cone assignments to the consular cone.

62. The program direction cone is a prestigious senior cone to which officers can convert only after completing two tours in positions which carry the program direction skill code.

63. a) Plaintiffs produced statistics which they claim indicate that, between 1976 and 1983, 38.5% of all out-of-cone assignments received by men in the political cone were to senior program direction positions, while only 14.6% of the out-of-cone assignments received by women in the political cone were to program direction positions. This difference measures 4.46 standard deviations, which is likely to be the result of chance only once in 100,000 times (two-tailed);

64. b) Similarly, plaintiffs' statistics indicated that 12.4% of the out-of-cone assignments received by men in the consular cone were to program direction positions, while only 6.6% of the out-of-cone assignments received by women in the consular cone were to program direction positions. This difference measures 2.23 standard deviations, which is likely to be the result of chance less than 3% of the time;

65. c) An analysis of *all* assignments shows that 4.2% of men in the consular cone received assignments to the program direction positions, while 2.6% of the women in consular cone received assignments to the program direction positions. This difference measures only 1.66 standard deviations.

66. Defendant's expert produced an analysis indicating that, as to those men and women who did attain transfer to the Program Direction cone, there was no disparity in the amount of time spent in class before attaining the transfer. In fact, the statistics show that at class 2, females reach the Program Direction cone faster than males. This disparity measured 3.39 standard deviations. For classes 3 and 4, the statistics indicate females spent less time in class before progressing to the Program Direction cone, but not at statistically significant levels. A similar study measuring the total time spent in the Service before reaching the Program Direction

cone also indicates that no disparity exists between men and women.

67. Defendant's analysis is not dispositive in that it measures the time in class and service of those who actually attain the Program Direction cone, and plaintiffs complain of a disparity in the number of women and men who are given out-of-cone assignments to positions which carry the program direction skill code and would thus qualify them for transfer to the Program Direction cone itself.

68. Defendant has provided no other rebuttal evidence concerning out-of-cone assignments to the consular cone.

### Evaluations

69. Written appraisals, known as Officer Evaluation Reports (OER's) or Employment Evaluation Reports (EER's), are generally prepared on all FSO's annually.

70. A standard EER form is required for the evaluation of performance periods of 120 days or longer.

71. Evaluations are prepared by an FSO's rating officer, who must be the rated member's supervisor, except under unusual circumstances. The rating officer's report is then reviewed by a reviewing officer, who is normally the rating officer's supervisor. The rating and reviewing officers are generally designated at the beginning of the rating period with the rated officer informed as to their identities.

72. The Foreign Affairs Manual requires that "[a] description of the [rated officer's] duties be agreed upon in writing within 45 days of the beginning of the rating period and amended, as necessary, with each change of assignment, assumption of additional duties, or other circumstances which warrant a review of performance against the standard of work expected of the [rated officer]." 3 FAM 522.-1(a).

73. The evaluations are used both as part of the promotion process and by career development officers in evaluating their client FSO's and advising them of assignments that would advance their ca-reers and to which they could reasonably aspire.

74. The evaluations are highly subjective and are generally seen as producing inflated ratings.

75. Plaintiffs claimed disparate treatment in evaluations. Plaintiffs introduced a survey of the summary performance and potential ratings in the 1977 OER's of a random sample of FSO's from classes 5 and 6. Plaintiffs' expert identified a random number of FSO's from classes 5 and 6, and defendants permitted plaintiffs to copy certain information from the 1977 OER's concerning these officers' overall performance and potential ratings. When an officer received more than one OER during the time period, only the first OER was included in these statistics.

76. The survey indicated that there was no significant difference in the performance ratings of men and women, but that the mean female potential rating was 6.98 and was 7.27 for males. The disparity between men and women measured 2.49 standard deviations, which means that there was only a possibility of 7 in 1,000 that it was due to chance (two-tailed).

77. Plaintiffs' expert also analyzed the potential ratings while holding the performance rating constant. That is, the expert compared the potential rating of female and male FSO's who received a performance rating of 5, signifying a very good performance. The analysis also included performance ratings of 6, 7, and 8. The results showed that at performance levels 6 and 7, a disparity existed with standard deviations measuring 2.55 and 2.03, respectively. No statistically significant disparity existed for performance ratings at levels 5 and 8.

78. Defendant claimed that plaintiffs' statistical evidence was inadequate because it did not control for the fact that women entered the Foreign Service later than men. However, the defendant failed to present any evidence showing that this factor would have explained the disparity demonstrated by the plaintiffs' statistics.

79. Neither the plaintiffs nor the defendant introduced statistical evidence re-

garding performance and potential ratings for any year other than 1977.

### Promotions

80. Selection Boards have been responsible for reviewing, recommending, and rank ordering Foreign Service Officers for promotion from pre–1981 classes 6 through 2 during the 1972 to 1983 time period. Promotions from classes 7 and 8, on the other hand, have been made administratively since 1978 and were made by Boards in a non-competitive fashion prior to that time.

81. Prior to 1981 all Foreign Service Officer promotions were submitted to the White House for nomination by the President and confirmation by the Senate. As of 1981, only initial ·commissions as FSO's upon tenuring and promotions into and within the Senior Foreign Service are forwarded to the White House. All other recommendations for promotion are submitted to the Secretary of State for approval.

82. The number of promotions authorized at a particular grade and, where appropriate, in a particular functional field, is established by management. The Boards rank order some or all of the officers reviewed and the authorized number of promotions is made by counting down the rank order list. All officers ranked and reached for promotion who have not separated from the Service are promoted if they have not violated loyalty, security, and suitability requirements of the Service.

83. Selection Boards review the files of officers who are eligible for promotion by virtue of having met the minimum time in class eligibility requirements at a particular class level. In addition, from 1972–1980, the Boards reviewed the files of those Foreign Service Officers who were not yet eligible in order to determine whether the minimum time in class requirement should be waived in cases of exceptional performance and potential. Officers for whom such waivers were granted were ranked for promotion jointly with officers who met the minimum time in class requirements.

84. Promotion rules and criteria are set out for each Board annually in precepts which result from yearly negotiations with the exclusive employee bargaining representative, the American Foreign Service Association (AFSA). The precepts are the controlling document of the promotion process, setting out promotion criteria, competition groups, and instructions on whether all or only part of the officers are to be rank ordered. In addition, since 1979, the Selection Boards have been provided with specific voting procedures, which guide the Boards' file review, discussion, and voting procedures but not the substance of the Boards' consideration, which is controlled by the precepts. To the extent that the precepts and voting procedures do not specify any aspect of the Boards' operations or considerations, such matters are left to the individual Board's judgment.

85. The precepts direct the Selection Boards to make their evaluations of officers based exclusively on a reading of their official performance files. That file is made up of each individual's performance evaluations (including evaluations on specified forms and memoranda of performance) while in the Foreign Service, records of training completed while in the Foreign Service, records of awards, letters of commendation (to the extent submitted by the officer), recommendations for disciplinary actions, and Inspectors Efficiency Reports relating to the officer. In addition, the file may contain records of other federal employment as specified in the regulations. 3 FAM 515.2. All materials in the performance file are subject to review and comment by the employee concerned. The Director of the Office of Performance Evaluation (PER/PE) has responsibility for reviewing all evaluation material prior to its inclusion in the employee's ·file. As a matter of practice, since at least 1975, PER/PE has had responsibility for deleting inadmissible comments from evaluation material. However, only since March 1979, have the regulations contained specific language authorizing PER/PE to delete inadmissible comments and to substitute language, as appropriate. Employees may also seek deletions through the grievance process. In general, Boards have been instructed to

emphasize the last five years' performance evaluations in making their decisions.

86. The Selection Board's ranking of officers is based on the Board's assessment of the officer's potential to perform at the next higher level.

87. Although there have been specific changes in competition groups and Selection Board procedures from year to year, as reflected in the precepts, the promotion process for members in classes 6, 5, 4, 3, and 2 has remained essentially the same throughout the 1972–1983 time period. In addition, although the competition groups differ from class to class, the promotion process is essentially the same for each of these classes.

88. The 1946 Foreign Service Act provided that all Foreign Service Officers were to be recommended for promotion by Selection Boards. Thus from 1972 to 1980, officers appointed prior to implementation of the Career Candidate Program were promoted from classes 7 and 8 by Selection Boards, either as probationary or non-probationary officers. In the case of probationary officers, from 1972–1975 the Selection Boards identified them as either promotable, deferred or recommended for separation. Beginning in 1976 they were identified as recommended or not recommended for promotion. For the entire period of 1972 to 1980 all probationary officers identified as promotable or recommended for promotion were promoted. Non-probationary junior officers who were recommended for promotion were rank-ordered by the Selection Boards for the period 1972 to 1975. From 1976 to 1980 they were either recommended or not recommended for promotion. The top 50% of non-probationary junior officers rank-ordered were promoted in the years 1972–1974. For the period 1975–1980 all non-probationary junior officers recommended for promotion were promoted.

Selection Boards are normally composed of Foreign Service Officers, members of other Foreign Affairs agencies, and at least one outstanding private citizen or public member. Since June 1973, at least 60% of the members of Selection Boards below the level of Career Minister were required to be members of the Foreign Service. FSO's on Selection Boards, so far as possible, have a personal rank at least one class higher than the employees being rated. No person may serve on a Selection Board for two consecutive years.

89. Under a June 29, 1973 agreement with AFSA, the Department of State is required to submit a list of potential candidates for Selection Board membership to AFSA before the convening of the first Board.

90. The Foreign Service Act of 1980 introduced the specific requirement that Selection Boards include women and minorities. This codified the Department's practice of prior years of seeking to include such members on the Boards whenever possible.

91. Selection Boards generally consider officers for promotion in classes 6, 2, and 1 on a class-wide basis, and in class 3 on both a class-wide and on a cone specific basis. In classes 5 and 4, FSO's compete for promotion on a cone specific basis.

92. Time spent in a given class is an important element in the promotion process. The precepts generally set forth minimum time-in-class requirements before an officer is even eligible for consideration for promotion.

93. From 1976 through 1980, a "zone merit" system was in effect for officers at classes 5 and 4. This system provided 80% of promotions to officers with greater seniority in class while, at the same time, ensuring that 20% of the promotion opportunities were available for rapidly moving, outstanding officers.

94. The Selection Boards determine the relative importance of any trait or competency at a particular level. They develop an overall impression of each officer's strengths and weaknesses relative to the group as a whole, and use that impression to score the individual. There is no evidence that women were disadvantaged in promotions from classes 8 to 7, classes 7 to 6, classes 4 to 3, classes 3 to 2, or classes 2 to 1.

95. The Court finds no significance in plaintiffs' analysis showing that in the years 1978, 1979, and 1980, in which two sessions of the class Selection Boards met to consider promotions to class 5, the first sessions underpromoted women while the second sessions overpromoted them. Not only is the methodology used to arrive at these results questionable, but the over-all statistics for each year show no disparity reflected in the promotion rates of women versus men. Defendant provided a study showing that there was no difference in time from entering class 6 to entering class 4, based on first or second board promotion, thus showing no harm to those women promoted in the second session.

96. The heart of plaintiffs' promotion claim is that females face a barrier at class 5 to their promotion to class 4. Plaintiffs introduced a logistic regression controlling for sex, time in class, cone, and allowing the effect of time in class to differ by cone which produced results indicating that between 1976 and 1983 women eligible for promotion in class 5 were significantly less likely to be promoted than men. The probability that these results would exist as a product of chance is less than 8% of the time (two-tailed).

97. Plaintiffs presented a further series of analyses which purported to support their position, all of which relied upon grade at hire. Plaintiffs' calculation of grade at hire was flawed and unreliable, however, and the results have no significance. In addition, these same analyses suffered from aggregation problems arising from attempting to obtain summary results from year-by-year surveys.

98. Defendant presented an analysis, a conditional logit accounting for time in class, which, for the period 1975–1983, showed a discrepancy between the promotion rates from class 5 for females and males, but the standard deviation measured only 1.76. This disparity would occur by chance less than 8% of the time (two-tailed).

99. Plaintiffs' expert, using the same conditional logit method but applying it to his data, calculated that the difference between male and female promotions for the period 1976–1983 measured 1.88 standard deviations, a disparity which could be expected to occur by chance 6% of the time (two-tailed).

100. The defendant's inclusion of the year 1975 favors the defendant because a comparatively high percentage of women were promoted in that year, a year prior to the 1976–83 period challenged by plaintiffs. However, it is not necessary to decide the probativeness of that inclusion because even the plaintiffs' statistical disparity is insufficient to establish a prima facie case of discrimination standing alone since it measures less than 1.96 standard deviations.

101. Defendant's expert also demonstrated that no pattern of discrimination existed at class 5 on a year-by-year basis. In fact, female FSO's from class 5 had a higher or equal promotion rate to males in half the years between 1975 and 1983. In particular, no significant disparity in class 5 promotions occurred in 1977. Defendant's expert testified that when analyzing a large number of persons and employment actions over a long period of time, a statistician would expect to observe occasional disparities (surpluses and deficites) such as were present in the defendant's analysis.

102. Time in class is the proper variable for explaining the apparent disparity of promotions of females from class. It is clear from the testimony that females are newer in the Service and have less time in each class.

103. While each expert had different data bases leading to different conclusions on many issues, these differences are irrelevant when comparing plaintiffs' logistic regression (PX 103B) with defendant's conditional logit. (Table 1, Model 2 of DX 8A).

104. Defendant's conditional logit accounting more accurately accounts for the promotion system used by the Foreign Service than does plaintiffs' use of a logistic regression analysis. Plaintiffs' own expert admitted to this conclusion.

105. The significance of these results at class 5, whether looking at plaintiffs' finding of 1.88 standard deviations or defend-

ant's 1.76, is lessened considerably as those analyses look only at one class. Plaintiffs' expert admitted that, as to class 4 above, the probability of selection for promotion appears to be the same for males and females. Defendant's conditional logit supports this position. In addition, plaintiffs made no claim of discrimination in promotion at classes 7 and 8.

106. When using Model 2 of the conditional logit (DX 8A, Table 1), the figures illustrate that, over classes 1 through 6, the disparity of promotion between males and females measures only 1.13 standard deviations—a statistically insignificant difference.

107. Plaintiffs also presented evidence showing a general prejudicial attitude against women in the Foreign Service:

(a) Benjamin Reid, who was Under Secretary of State for Management from 1977–1981, testified that the Foreign Service, as a result of traditionally being "white, male, and Ivy League," had "set ways of doing things" and that although during his tenure the Foreign Service "had come a long way," it nevertheless "still had a long way to go" at the time he left in correcting these biased attitudes. However, Mr. Reid's testimony also indicated that such problems were more attributable to hiring than employment and that substantial improvements had been made by 1981 when he left the Department.

(b) A report written in 1977 by a committee within the State Department asserted that "attitudinal resistance to equal employment opportunity ... [is] still widespread in the Department" but did not focus on class 5 promotion discrimination in particular.

(c) A report published in 1984 by the Women's Research and Education Institute of the Congressional Caucus for Women's Issues stated that " 'what some identify as traditional elitist attitudes have [worked] to limit severely employment opportunities for women and minorities [in the Foreign Service]' " (quoting a 1981 report prepared by the U.S. Commission on Civil Rights).

108. No plaintiff class member testified as having encountered any delay or difficulty in promotions from class 5 to class 4.

### CONCLUSIONS OF LAW

1. Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, prohibits discrimination in employment on the basis of sex:

a) It shall be unlawful employment practice for an employer—

1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...; or

2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex ...

42 U.S.C. § 2000e–2(a).

2. Title VII prohibits disparate treatment of women and policies, practices or patterns of behavior which have a disparate impact on women. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) (hereafter *Teamsters* ); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); *Segar v. Smith,* 738 F.2d 1249, 1265 (D.C.Cir.1984), certiorari denied *sub nom. Meese v. Segar,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).

3. Disparate treatment is the intentional "treat[ment of] some people less favorably than others because of their race, color, religion, sex or national origin." *Teamsters, supra,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. *See also Palmer v. Shultz,* 815 F.3d 84, 90, *Segar,* 738 F.2d at 1265; *Valentino v. USPS,* 674 F.2d 56, 60 n. 1 (D.C.Cir.1982). In a disparate treat-

**1568**

ment case, proof of discriminatory motive is essential. *Id.*

4. A disparate impact case involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters, supra,* 431 U.S. at 335, n. 15, 97 S.Ct. at 1854 n. 15. *See also Palmer,* 815 F.2d at 90; *Segar v. Smith, supra,* 738 F.2d at 1266; *Valentino v. USPS,* 674 F.2d at 60 n. 1. It is not necessary to prove discriminatory motive in order to establish a case of disparate impact. *Id.*

5. In both a disparate treatment and a disparate impact case, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Teamsters, supra,* 431 U.S. at 358, 97 S.Ct. at 1866; *Segar v. Smith, supra,* 738 F.2d at 1267; *Valentino v. USPS, supra,* 674 F.2d at 67.

6. A prima facie case of disparate treatment consists of "evidence adequate to create an inference" that employment decisions were "based on a discriminatory criterion illegal under the Act." *Teamsters, supra,* 431 U.S. at 358, 97 S.Ct. at 1866.

7. In order to create that inference in class actions, plaintiffs can "allege the existence of a disparity between men and women in selection rates for a particular job or job benefit and further allege that this disparity was caused by an unlawful bias...." *Palmer, supra,* 815 F.2d at 90.

8. "Proof that the observed disparity was caused by an unlawful bias against women need not be direct. Circumstantial evidence that the disparity, more likely than not, was a product of unlawful discrimination will suffice to prove a pattern or practice disparate treatment case. *See Teamsters, supra,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. Indeed, this circumstantial evidence may itself be entirely statistical in nature. *See, e.g., Segar v. Smith, supra,* 738 F.2d [at] 1278–79...." *Palmer,* 815 F.2d at 90.

9. Statistical analysis can reveal the probability that a particular disparity in male and female selection rates would oc-

cur as a matter of chance if there were no discriminatory bias in operation. It thus indicates "the *probability* that the disparity is merely a random deviation from perfectly equal selection rates." *Palmer,* 815 F.2d at 91.

10. If the disparity between male and female selection rates is "sufficiently large so that the probability that the disparities resulted from chance is sufficiently small, then a court will infer that, more likely than not, the disparity was a product of unlawful discrimination...." *Palmer,* 815 F.2d at 91. *See Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Segar v. Smith, supra,* 738 F.2d at 1278.

11. An inference of discrimination adequate to create a prima facie case of disparate treatment is established by statistics alone when a plaintiff presents evidence of a disparity which measures 1.96 standard deviations. *Palmer,* 815 F.2d at 92; *Segar v. Smith, supra,* 738 F.2d at 1266, 1283; *Hartman v. Wick,* 600 F.Supp. 361, 370 (D.D.C.1984); *Little v. Master-Bilt Products, Inc.,* 506 F.Supp. 319, 333 (N.D.Miss.1980); *Vuyanich v. Republic National Bank,* 505 F.Supp. 224, 271 (N.D. Tex.1980), vacated on other grounds, 723 F.2d 1195 (5th Cir.1984); *Cooper v. University of Texas,* 482 F.Supp. 187, 194 (N.D. Tex.1974). This means that there is a 5% or less probability that a disparity this great would occur by chance, using a two-tailed approach; 2½% if using a one-tailed test.

12. In this case, statistical probabilities should be measured using a two-tailed test of statistical significance—which measures the probability that a disparity this large in either direction (*e.g.,* that women are under-promoted or overpromoted to this extent) would occur by chance. *Palmer,* 815 F.2d at 95.

13. When statistics show a disparity in treatment which does not measure at least 1.96 standard deviations, a plaintiff can establish a prima facie case of disparate treatment by presenting other evidence,

in addition to the statistics, to demonstrate that "the disparity resulted from unlawful discriminatory animus" rather than chance. *Id.* at 96.

14. Plaintiffs can also present, as part of a prima facie case of discrimination, evidence showing that decisions made by an employer depend largely on subjective factors. Several courts have recognized that "subjective criteria may well serve as a veil of seeming legitimacy beyond which illegal discrimination is operating." *Segar v. Smith, supra,* 738 F.2d at 1276. *See also, e.g., Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir.1972) ("promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate supervisor are a ready mechanism for discrimination"); *Brown v. Gaston County Dyeing Machine Co.,* 457 F.2d 1377, 1383 (4th Cir.1972) ("the lack of objective guidelines for hiring and promotion ... serve[s] to corroborate, not to rebut, the racial bias pictured by the statistical pattern of the company's work force").

■ 15. An inference of discrimination can also be established by proof that an employer discriminated against women with respect to the factors upon which an employer relies in making employment decisions, such as evaluations and awards. *Segar v. Smith, supra,* 738 F.2d at 1283–1284. Thus, the establishment of a prima facie case of discrimination with respect to one aspect of employment can support an inference of discrimination in other aspects of employment. *Id.*

■ 16. The cessation of or a decrease in discrimination during the period of liability does not relieve the employer of liability for discrimination which occurred during the appropriate time period. *Teamsters, supra,* 431 U.S. at 341–342, 97 S.Ct. at 1858; *Donnell v. General Motors Corp.,* 576 F.2d 1292, 1295 n. 3 (8th Cir.1978); *Rule v. International Ass'n of Bridge, Structural and Ornamental Ironworkers,* 568 F.2d 558, 568 (8th Cir.1977).

■ 17. A prima facie case of disparate impact consists of evidence showing that an employment practice has a disparate adverse impact on a group protected by Title VII. *See* cases in Conclusion of Law 4 above.

18. Once a plaintiff has established a prima facie case of disparate treatment, the burden of production shifts to the employer to present evidence showing "a legitimate, non-discriminatory reason" for its actions. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). However, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1093.

19. Once a plaintiff has established a prima facie case of disparate impact, the burden of persuasion shifts to the employer to show that the employment practice "bear[s] a demonstrable relationship to successful [job] performance" or is otherwise "job related." *Griggs v. Duke Power Co., supra,* 401 U.S. 424 at 431, 91 S.Ct. 849 at 853.

■ 20. An employer can respond to a prima facie case of employment discrimination in two ways. First, the employer can attack the prima facie case directly by attempting to refute the plaintiff's claim that a disparity exists in the position of the plaintiff's class and the position of the other employees. As the court explained in *Segar v. Smith, supra,* 738 F.2d at 1268:

> Challenging the accuracy or significance of plaintiffs' proof, a defendant seeks to show that the alleged disparity on which plaintiffs' case is bottomed does not exist. Such a defense can of course be raised against both a disparate treatment and a disparate impact claim. Typically the challenge will focus on the integrity of the plaintiffs' statistical methodology and the significance of the results shown. Often the defendant will supplement the critique with alternative statistical analyses tending to refute the plaintiffs' evidence of disparity.

*See also Palmer,* 815 F.2d at 99 (defendants may "challenge the statistical calculations upon which the inference of discrimination is based").

21. In attacking plaintiffs' statistics, an employer must generally introduce evidence rather than resting on "[m]ere conjectures and assertions." *Id.* at 101 n. 13. It normally bears the burden of, first, presenting "credible evidence that the statistical proof is defective" and, second, presenting "a plausible explanation of how the asserted flaw is likely to bias the results" against the employer. *Id.*

22. If the employer is unsuccessful in refuting the plaintiff's claim that a disparity exists, then the burden shifts to it "to show that any observed disparities between plaintiffs and the majority group did not result from discrimination violative of Title VII." *Segar v. Smith, supra,* 738 F.2d at 1268.

■■ 23. In a disparate treatment case, the burden of production shifts to the employer to present evidence showing that the disparity "resulted from some legitimate, non-discriminatory factor." *Palmer,* 815 F.2d at 99. In order to meet the burden of production, it is not generally enough for a defendant to "rebut statistical evidence by mere conjectures or assertions, without introducing evidence to support the contention that the missing factor can explain the disparities as a product of a legitimate, non-discriminatory selection criterion" (footnote omitted). *Id. See, Bazemore v. Friday,* —— U.S. ——, 106 S.Ct. 3000, 3009–3011, 92 L.Ed.2d 315 (1986).

24. In a disparate impact case, the burden of persuasion shifts to the employer to show that the employment practice which plaintiff has shown to have a disparate impact "bear[s] a demonstrable relationship to successful [job] performance" or is otherwise "job related." *Griggs supra,* 401 U.S. 424 at 431, 91 S.Ct. 849 at 853. *See also, Albemarle Paper Co. v. Moody, supra,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Segar v. Smith, supra,* 738 F.2d at 1267; Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. Part 1607 (1978).

25. These allocations of proof merge, however, when an employer articulates an employment practice as the legitimate, non-discriminatory reason for the disparity in treatment shown by a plaintiff's prima facie case. The articulation of a business practice by the employer has "the effect of putting before the court all the elements of a traditional disparate impact case." *Segar v. Smith, supra,* 738 F.2d at 1270. "Thus, when an employer defends a disparate treatment challenge by claiming a specific employment practice causes the observed disparity, and this defense sufficiently rebuts the plaintiffs' initial case of disparate treatment, the defendant should at this point face a burden of proving the business necessity of the practice" (citation omitted). *Id.*

26. If the employer refutes a plaintiff's prima facie case of disparate treatment by articulating a legitimate non-discriminatory reason for the disparity in treatment shown by a plaintiff's prima facie case, then the plaintiff "must ... be afforded a fair opportunity to show that [the employer's] stated reason ... was in fact pretextual." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). *See also Texas Department of Community Affairs v. Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1094. The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employee or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095.

### Awards

■■ 27. Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a), forbids employers to limit employees in any way that would "adversely affect [any individual's] status as an employee" because of the employee's sex. Thus Title VII forbids discrimination against women in awards. *Palmer,* 815 F.2d at 113. Discrimination in awards violates Title VII regardless of whether awards have any effect on officers' career advancement. *Id.*

28. Plaintiffs' statistics demonstrated that women in classes 1 to 5 had received disproportionately few Superior Honor Awards than men between 1976 and 1983. This evidence, showing a disparity measuring 3.1 standard deviations, constitutes a prima facie violation of Title VII.

29. Defendant cannot rebut plaintiffs' prima facie demonstration of discrimination in granting the Superior Honor Award on the ground that there is no disparity in the other awards examined. *Palmer,* 815 F.2d at 113. In order to rebut the inference raised by plaintiffs' strong statistical evidence, defendant "was required to present evidence explaining the extreme disparity between the numbers of men and women receiving the Superior Honor Award." *Id.* Defendant has not presented any such evidence.

30. Plaintiffs have established discrimination in the granting of the Superior Honor Award to women in classes 1 through 5 during 1976 to 1983 in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Id.* at 113–114.

*Assignments*

31. Title VII forbids employers to assign employees to different job classifications based on their sex. 29 C.F.R. § 1604.3(a); *Thompson v. Sawyer,* 678 F.2d 257, 283–285 (D.C.Cir.1982) (women employed as "bindery workers"; men employed as "bookbinders"); *Wilmore v. City of Wilmington,* 699 F.2d 667, 672 (3d Cir. 1983) (white police officers, but not black officers, assigned to administrative positions); *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 328 (5th Cir.1977) (black employees assigned to least desirable job categories in a large manufacturing plant). *See also Palmer,* 815 F.2d at 97; *Connecticut v. Teal, supra,* 457 U.S. at 448, 102 S.Ct. at 2525.

32. Plaintiffs' statistics establish that women who were tested between 1975 and 1980 and who were subsequently hired between 1976 and 1983 were overassigned to the consular cone and underassigned to the political cone as a result of the disparate impact of the political functional field portion of the Foreign Service entrance examination. Plaintiffs have shown that the difference between the actual number of females assigned to the consular and political cones and the expected number of females assigned to the consular and political cones is statistically significant. They have also shown that this disparity in cone assignment was caused by the fact that women received lower scores on the political functional field examination.

33. Defendant failed to rebut plaintiffs' prima facie demonstration of disparate impact. Although it raised problems concerning plaintiffs' use of the State Department's personnel tapes, those problems did not affect the analysis that was based on computer tapes provided by the Educational Testing Service.

34. Defendant failed to show that the functional field portion of the written examination was job related.

35. Defendant failed to establish that the preference of women for consular work was a legitimate, non-discriminatory reason for the cone assignments because defendant did not generally know candidates' preferences and, even if the preference was volunteered, defendant did not consider it a substantial factor in making assignments. *See Lanphear v. Prokop,* 703 F.2d 1311, 1317 (D.C.Cir.1983); *Pittman v. Hattiesburg Municipal Separate School District,* 644 F.2d 1071, 1076 (5th Cir.1981); *Kamberos v. GTE Automotive Electric, Inc.,* 603 F.2d 598, 602 (7th Cir.1979). In addition, defendant failed to present any evidence regarding the actual preferences of women who entered the Foreign Service between 1976 and 1983 and took the written test between 1975 and 1980, the years for which adverse impact was shown.

36. Defendant has therefore failed to rebut plaintiffs' prima facie showing of discrimination in initial cone assignments caused by the adverse impact of the political functional field examination on women who took the exam during 1980 and were hired between 1976 and 1983. Plaintiffs have therefore established discrimination in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.*, with regard to this issue.

■ 37. Plaintiffs' statistical proof of underrepresentation of women in Deputy Chief of Mission positions between 1972 and 1983 establishes a prima facie violation of Title VII. Op. at 1573. The inclusion of data between 1972 and 1976 does not undercut the probative force of this evidence. *Palmer*, 815 F.2d at 111; *Bazemore v. Friday, supra,* —— U.S. at —— n. 13, 106 S.Ct. at 3010 n. 13.

38. Defendant has failed to rebut this proof by showing that the disparity between women and men in DCM assignments would not exist if the 1972 to 1976 data were excluded from plaintiffs' statistical analysis. *Palmer*, 815 F.2d at 112.

39. The absence of proof of a significant underappointment of women to other prominent positions does not rebut plaintiffs' prima facie case of discrimination in DCM assignments. *Id.* at 111. Extreme statistical disparities can be rebutted only by "other evidence directly relating to the job at issue." *Id.* Defendant produced no such rebuttal evidence.

40. In order to rebut this proof by arguing that women were not appointed to DCM positions because they were instead appointed as Ambassadors, defendant must present proof that women were overappointed as Ambassadors. Defendant has produced no such evidence.

41. Defendant has therefore failed to rebut plaintiffs' prima facie showing of discrimination in appointment to DCM during 1976–83. Therefore, plaintiffs have established a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

■ 42. Plaintiffs' statistical proof of a disproportionate underassignment of women in classes 4, 5, and 7 during 1976–81 to stretch positions and overassignment of women in classes 4, 5, and 7 to down-stretch positions during the same period constitutes a prima facie violation of Title VII. *See Palmer*, 815 F.2d at 109.

43. Defendant's argument that these disproportionate assignments did not violate Title VII because they had not been shown to affect women's promotion opportunities is incorrect as a matter of law. *Palmer*, 815 F.2d at 109. Plaintiffs are "entitled under 42 U.S.C. Sec. 2000e–16 to bring a claim of sex discrimination with respect to 'all personnel actions,' including any category of assignments, regardless of how these assignments relate to other personnel actions, like promotion decisions." *Id.*

44. The failure to account for "cross-class competition" cannot defeat plaintiffs' prima facie case, because that case properly compares the likelihood of male and female officers within the same class to receive assignments to positions that are stretch or down-stretch assignments *for them. Id.*

45. Defendant cannot rebut plaintiffs' prima facie showing of discrimination in assignments to stretch and down-stretch positions based on the contention that plaintiffs' data reflects the number of years in assignments, rather than the number of assignments, when plaintiffs based their analysis on the only data available to them. *Id.* at 109–110. *Trout v. Lehman,* 702 F.2d 1094, 1102 (D.C.Cir.1983), *vacated on other grounds,* 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984). Moreover, in order to prevail on this rebuttal argument, defendant would have to show that "the imperfections of the data caused the disparities produced by the statistical analysis." *Id.* It failed to do so.

46. In order to rebut plaintiffs' evidence by arguing the disparity occurred because women preferred down-stretch assignments, defendant must present sufficient evidence that preference explains the disparity in order to undermine the probative weight of the plaintiffs' statistics. *Palmer,* 815 F.2d at 110.

47. Defendant has failed to do so.

48. Defendant has therefore failed to rebut plaintiffs' prima facie showing of discrimination against women in classes 4, 5, and 7 in stretch and down-stretch assignments made during 1976–81. Plaintiffs have established a violation of Title VII of

the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* in these assignments.

49. Plaintiffs' statistical evidence of a disproportionate overassignment of women in the political, economic, and administrative cones to out-of-cone assignments in the consular cone establishes a prima facie violation of Title VII.

50. Defendant's argument that discrimination in out-of-cone assignments is irrelevant unless it is shown to affect promotion probabilities is incorrect as a matter of law. *See, Palmer,* 815 F.2d at 98.

51. In order to rebut plaintiffs' evidence by showing that women on the whole preferred consular assignments, defendant must present "evidence showing that more women than men preferred out-of-cone assignments to the consular cone." *Id.* at 106. Defendant has presented no such evidence and therefore has failed to rebut the prima facie showing on this basis.

52. Defendant has failed to present any other evidence rebutting the prima facie showing.

 53. Plaintiffs have therefore established discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.,* in out-of-cone assignments from the economic, political and administrative cones to the consular cone.

54. Plaintiffs' statistical proof of a disproportionate underassignment of women in the political and consular cones to out-of-cone assignments in the program direction cone establishes a prima facie violation of Title VII. *See, Palmer,* 815 F.2d at 107.

55. Defendant failed to present any statistical evidence of explanatory factors to rebut plaintiffs' prima facie case.

56. Defendant's evidence concerning the comparative rates at which men and women transfer to the program direction cone does not constitute adequate rebuttal evidence because "[t]he issue was not whether those women who were able to transfer to the program direction did so with the same speed as their male counterparts; rather, the issue was whether proportionally fewer women than men were

able to transfer to program direction positions at all." *Id.* at 107–108.

 57. Plaintiffs have therefore established discrimination in out-of-cone assignments from the political and consular cones to program direction positions in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

### Evaluations

 58. Title VII forbids employers to discriminate in evaluations. *Palmer,* 815 F.2d at 105.

 59. The statistics presented by plaintiffs demonstrated a statistically significant disparity between men and women in the 1977 potential ratings of FSO's in classes 5 and 6. Therefore, plaintiffs have established a prima facie case that women in classes 5 and 6 were discriminated against in evaluations during 1977.

60. Defendant has failed to produce any relevant evidence to rebut the plaintiffs' prima facie case.

61. Therefore, plaintiffs have established discrimination in 1977 evaluations for women in classes 5 and 6 in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

### Promotions

 62. Title VII forbids employers to discriminate between similarly situated men and women in promotions. *Valentino v. USPS, supra,* 674 F.2d at 63, 67; *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir. 1981).

 63. Statistical evidence based on a reliable conditional logit accounting shows that during 1976–83 time period women who were similarly situated with regard to time in class and cone were underpromoted from class 5 to class 4. However, the disparity measurement of between 1.76 and 1.88 standard deviations is short of the standard deviations necessary to establish a prima facie case standing alone. *Palmer,* 815 F.2d at 102.

64. Plaintiffs' evidence of a generally biased attitude provides minimal but addi-

tional support to show that the statistical disparity resulted from discrimination rather than chance.

65. The plaintiffs have established discrimination in the 1977 evaluations for class 5. *See* Conclusion of Law 61. However, while discrimination in evaluations in general is probative of promotion discrimination since evaluations are heavily relied upon by Selection Boards, the support which this finding provides for these plaintiffs' promotion discrimination claim is extremely limited. Discrimination in 1977 evaluations is not relevant to 1976 class 5 promotions. In 1977, women in class 5 were not significantly disadvantaged in promotions so the finding would support only those years after 1977 in which women in class 5 were underpromoted. However, in those later years, any residuary impact caused by the 1977 evaluations is reduced as subsequent non-discriminatory evaluations are made annually and added to the FSO's personnel file for consideration by future Selection Boards.

66. On the other hand, the fact that no discrimination has been shown in evaluations in any years other than 1977, although plaintiffs allege class 5 discrimination over the entire 1976–83 period, constitutes persuasive evidence that promotion discrimination did not occur during that period.

67. Plaintiffs have also established discrimination in the granting of Superior Honor Awards for class 5 during the period from 1976–83. *See* Conclusion of Law 30. This finding provides some additional support to the plaintiffs' promotion discrimination claim since awards are also considered by Selection Boards during the promotion process. However, the fact that other awards, such as the Distinguished Honor Award, were not awarded discriminately during the same period persuasively supports a finding that promotion discrimination did not occur between 1976 and 1983.

68. Plaintiffs have also established some discrimination in assignments which provides some additional support for plaintiffs' promotion discrimination claim since it is probable that the nature of an assignment will carry some weight in the promotion process.

(a) Class 5 was discriminated against in Stretch and Down-stretch assignments from 1976 to 1981, *see* Conclusion of Law 48, which resulted in women receiving more than their share of down-stretch assignments and too few stretch assignments during that period. It is likely that the opportunity to successfully perform at a position rated higher than an FSO's grade will help assure a promotion from class 5 to 4 while performance at a lower-rated position could indicate a lack of initiative and other negative qualities. However, no discrimination in stretch or down-stretch assignments was proven for years 1982 and 1983. In addition, the amount of impact of this type of assignment on promotions is unclear given that discrimination in stretch and down-stretch assignments was also found in classes 4 and 7, classes in which no promotion discrimination existed.

(b) Plaintiffs also established some discrimination in the assignment of women as Deputy Chiefs of Mission. *See* Conclusion of Law 41. However, such assignments are not made from class 5 FSO's so the finding is irrelevant to this limited class 5 promotion issue.

(c) Plaintiffs established out-of-cone assignment discrimination in the overassignment of women from the economic, political and administrative cones to the consular cone and underassignment of women from the political and consular cones to the Program Direction Cone during 1976–83. *See* Conclusion of Law 36. However, plaintiffs failed to establish a significant causal relationship between this finding and class 5 promotion discrimination. In addition, no discrimination was found in other out-of-cone assignments.

(d) Plaintiffs also established initial cone assignment discrimination in the overassignment of women to the consular cone and underassignment to the political cone resulting from the disparate impact of the 1975–80 political functional field portion of the Entrance Examination. *See* Conclusion of Law 53. However, the plaintiffs failed to establish a significant causal relation-

ship between initial cone assignments and promotions. In addition, no discrimination was found in other initial cone assignments of FSO's who did not take the challenged exam portion during 1975–80 or who did not enter the Service through the exam procedure or who took the exam but were assigned to other cones.

69. Based on all the evidence, the plaintiffs have established a marginal prima facie case of discrimination in promotions from class 5 to 4 during the 1976–83 period.

70. The defendant has rebutted the plaintiffs' prima facie case with the evidence already mentioned above. In addition, plaintiffs have failed to make even a prima facie case that the State Department discriminated against women at other grades of the promotional process or that the Department discriminated "overall" in promotions from classes 1 through 6. While such findings are not dispositive for the defendant, they are certainly persuasive rebuttal evidence. Also, even if some statistical disparity was present in class 5 in the aggregate from 1976 to 1983, there was no pattern of discrimination at class 5 on a year-by-year basis. Female FSO's had a higher or equal promotion rate to males in half of the years observed. If there was a true class 5 barrier, it would not be expected to appear and disappear.

71. The totality of the evidence reveals that the plaintiffs have failed to show by a preponderance of the evidence that women were discriminated against in class 5–4 promotions during 1976–83.

## CONCLUSION

Accordingly, judgment will be entered for the defendant on the class 5 promotion claim and that claim dismissed. Judgment will be entered for the plaintiffs on the remaining claims. An appropriate order follows.

## ORDER

In accordance with the findings of fact and conclusions of law filed herein; the Court having conducted a trial without a jury between May 6, 1985 and June 5, 1985 on those claims raised by the portion of the class certified as all female Foreign Service Officers employed by the U.S. State Department at any time between February 4, 1976 and May 6, 1985; the opinion of the Court of Appeals which remanded these issues, *Palmer v. Shultz*, 815 F.2d 84 (D.C. Cir.1987), and upon consideration of the evidence submitted by the parties, and the entire record, it is by the Court this 2nd day of July, 1987

ORDERED that final judgment shall be entered for the defendant in these consolidated cases on the Title VII promotion discrimination claim and the claim is hereby dismissed with prejudice; and it is

FURTHER ORDERED that judgment shall be entered for plaintiffs as to the remaining six claims and those claims shall proceed for a determination as to the appropriate remedies.